Nos. 22-5424/5427

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

Oct 23, 2024

KELLY L. STEPHENS, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF KENTUCKY |
| | ) | |
| JAMES GARFIELD CHARLES (22-5424); VINCENT ADAMS VASSOR (22-5427), | ) | |
| | ) | |
| | ) | |
| | ) | AMENDED OPINION |
| Defendants-Appellants. | ) | |
| | ) | |

Before: STRANCH, LARSEN, and DAVIS, Circuit Judges.

**JANE B. STRANCH, Circuit Judge.** James G. Charles and Vincent Adams Vassor appeal their convictions and sentences for various drug and firearm offenses stemming from their alleged participation in a conspiracy to sell methamphetamine. Both challenge the sufficiency of the evidence to sustain their convictions for conspiracy. Charles also challenges the sufficiency of proof that he possessed a firearm in furtherance of a drug trafficking conspiracy. The Defendants further challenge the propriety of a witness's remark insinuating that they belonged to a gang in Los Angeles, urging that this statement warrants a mistrial, and contend that the district court's modification of the pattern jury instruction for venue in a conspiracy case amounted to reversible error. Finally, Vassor argues that his sentence was procedurally unreasonable because the district court inappropriately deferred to the Sentencing Guidelines and accompanying Commentary, and improperly calculated the drug quantity. We **AFFIRM**.

## I. BACKGROUND

### A. Facts

This appeal centers on an alleged drug trafficking conspiracy by James Charles and Vincent Vassor. Initially, the Government charged a third defendant, Tony Cloyd, with conspiracy; however, Cloyd ultimately pleaded guilty to drug trafficking and agreed to cooperate with the Government prior to trial. Zane Sloan, whom local police had investigated and charged in connection with selling methamphetamine, posed as a customer and orchestrated controlled buys of drugs involving Charles, Vassor, and Cloyd. Cloyd introduced Sloan to Charles in October 2020. Prior to becoming a government informant, Sloan estimated he purchased several pounds of drugs from Charles, buying methamphetamine "two or three times," typically purchasing one or two pounds, but "[a] few times" buying "eight or ten pounds."

During this period, Vassor was living in Los Angeles but commuted to Kentucky, residing in Lexington—ostensibly at Charles's home—for up to a month at a time. Sloan purchased drugs, including "cocaine and pills and different things," from Vassor "five or six times," mostly methamphetamine and "a little bit of heroin," approximately an "eight ball and maybe a quarter-ounce," for a total of approximately four to six pounds.

When Sloan ordered drugs from Vassor, Charles sometimes delivered them. Sloan also ordered drugs from Charles, initially through Cloyd, but later by contacting Vassor. Toward "the end" of the investigation period, however, Sloan called Charles directly to arrange drug transactions. According to Sloan, Charles, Vassor, and Cloyd became his exclusive sources for methamphetamine from October through December 2020. Cloyd testified that he "[n]ever" obtained drugs from Vassor, and "really didn't know [Vassor] to be involved in any of it," nor did he know where Vassor lived. Cloyd and Sloan never discussed Vassor.

Some of the transactions with Sloan involved guns. Sloan transferred guns to Vassor "two or three times," ranging from between one to "five, maybe six" guns in exchange for methamphetamine or money, for a total of "probably six, seven, [or] eight" guns. He sold Charles "one gun, maybe two."

From October through December 2020, Richmond Police conducted controlled buys of methamphetamine from Sloan, resulting in his arrest on New Year's Eve. Police also searched his home, seizing "14 ounces" of methamphetamine, a "gram of heroin," and a pound of marijuana that, according to Sloan, all came from Vassor. After his arrest, Sloan agreed to cooperate with law enforcement and help them identify drug suppliers "[u]p the chain."

While serving as an informant, in January 2021, Sloan contacted Cloyd looking for methamphetamine. Cloyd had never dealt methamphetamine, but he "called around" looking on Sloan's behalf. Cloyd eventually reached Robert Solomon, who "got ahold" of the drugs and met Cloyd, Charles, and Sloan to sell the latter "four to five pounds" of methamphetamine. Though Cloyd did not know from whom Solomon got the methamphetamine, Cloyd "assume[d] it came from [Charles],"[1] but "never asked any questions." Cloyd obtained methamphetamine from Charles and sold it to Sloan an additional "time or two." In total, Cloyd called Charles to obtain drugs "[f]our to five" times, buying up to a pound each time. Sometimes Cloyd paid for the drugs on receipt, other times, Charles "front[ed]" the drugs to him, and Cloyd paid him later.

On January 7 and January 14, 2021, Sloan conducted two controlled buys from Cloyd that were supplied by Charles. A third controlled buy took place on February 8, when Vassor sold Sloan a pound of methamphetamine in a Target parking lot. Sloan secretly recorded the buy. The

---

[1] In the trial transcript, witnesses sometimes refer to Charles as "Casper," and to Vassor as "Scooby" or "Snoopy." For consistency and clarity, we use their given names throughout.

video shows Vassor agreeing to "run to" Charles's house to "grab" a pound of methamphetamine. A second video shows Sloan handing Vassor money for the methamphetamine and discussing the payment Sloan owed Vassor for prior transactions.

Sloan arranged for a final controlled buy of three pounds of methamphetamine from Charles on June 8. That day, Sloan called Vassor on a line monitored by investigators. Vassor was in California at the time but promised that "his boy was back at the house" and that Vassor would contact him on Sloan's behalf. Less than 30 minutes later, Vassor called Sloan back, again on a monitored line, and explained that "his boy" was with his son out in Frankfort until about 4:00 p.m. and would reach out to Sloan directly afterwards. Just after 5:00 p.m., Charles called Sloan, stated he was at his house, and agreed on the quantity of methamphetamine Sloan would purchase and the time and location of the sale; investigators also monitored this call. Law enforcement surveilled Charles's home, and when Charles left, police pulled him over on Richmond Road. Officers seized the three pounds of methamphetamine from the backseat of his car.

That same day, police executed a search warrant for Charles's home, where they discovered almost $25,000 in cash, four pounds of methamphetamine, 200 grams of heroin, and 200 grams of cocaine, all of which (according to DEA Task Force Officer and Narcotics Detective Keith Parke) was worth between $70,000 to $75,000. Officers also found digital scales, baggies containing narcotics, ammunition, and 14 firearms.

## B. Procedural history

### 1. Trial

A grand jury returned an indictment against Charles, Cloyd, and Vassor on July 1, 2021. Cloyd pleaded guilty, accepting a plea agreement that specified he would testify for the

Government at trial. On January 6, 2022, a grand jury returned a superseding indictment against Charles and Vassor containing seven counts: conspiracy to distribute 500 grams or more of a methamphetamine mixture or substance in violation of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 846 (Count 1); possession with intent to distribute 500 grams or more of a mixture or substance containing methamphetamine in violation of § 841(a)(1) (Count 2) against Charles only; possession with intent to distribute 100 grams or more of a mixture or substance containing heroin in violation of § 841(a)(1) (Count 3) against Charles only; possession with intent to distribute a mixture or substance with a detectable amount of cocaine in violation of § 841(a)(1) (Count 4) against Charles only; distribution of 50 grams or more of a mixture or substance containing methamphetamine in violation of § 841(a)(1) (Count 5) against Vassor only; possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A) (Count 6) against Charles only; and unlawful possession of a firearm as a person previously convicted of a felony under 18 U.S.C. § 922(g)(1) (Count 7) against Charles only.

Trial commenced on January 18, 2022. The Government called several witnesses, including the government agents who conducted the investigation, Sloan, and Cloyd. The agents testified to the amount and type of drugs and firearms seized during the investigation. Detective Keith Parke testified that he believed the pistols discovered in Charles's bedroom served to protect Charles, the drugs he trafficked, and the proceeds of that trafficking.

Zane Sloan testified that he bought drugs from both Charles and Vassor. He also testified about his gun sales to Charles and Vassor, and the alleged structure of the drug enterprise. When asked about the relationship between Charles and Vassor, Sloan testified that he believed they were "partners" because Vassor got his drugs from Charles, though Sloan admitted that "[Vassor]

didn't tell me that, but I know where he was going" because "other people talk and just—I just [knew] it."

Sloan testified on direct that he received about $1,500 from the Government "to get out of town for a few days." The Government asked whether there had "been concerns for your safety;" defense counsel objected, and the court responded that the Government could "ask if he had concerns." When the Government asked Sloan again whether he had "any concerns for [his] safety," Sloan answered yes, adding that Charles and Vassor were "supposed to belong to some kind of club out there in California," and Sloan "figured I know how they operate" and once "[t]hey found out I was telling on them, then they would call them, and they would come hunting for me. So I just wanted to be out of town for a while." Vassor moved for a mistrial based on Federal Rule of Evidence 404(b) because Sloan "testified that [Vassor] was a member of some club out in Los Angeles, which obviously creates an inference with this jury that . . . there's gang affiliation." Charles joined in the motion, which the court denied, ruling that there was "absolutely no basis for a mistrial based on this line of questions."

Antonio Cloyd testified that he had pleaded guilty to conspiring to distribute methamphetamine. When asked whether he was "in a conspiracy and agreement with others who were selling," however, Cloyd responded, "[n]ot so much agreement," though Charles "agreed to sell" methamphetamine to him. The Government also questioned Cloyd about Vassor's involvement. When asked whether he knew Vassor, Cloyd stated that he "[j]ust met him."

At the close of evidence, Charles's counsel moved for dismissal of the charges against him under Federal Rule of Criminal Procedure 29(a), arguing that the Government had presented insufficient evidence of a conspiracy. Vassor also moved for a directed verdict of acquittal as to counts 1 and 5 of the superseding indictment. Neither defendant argued that a variance from the

indictment occurred. The Government responded by listing the evidence it proffered in support of each count, and the court denied both motions, finding sufficient evidence to present each count to the jury.

The court convened a jury instructions conference with counsel. After reviewing and altering the instructions, the court asked counsel if they had "[a]ny other changes." The Government responded that it had "[n]o additional changes"; defense counsel did not respond with any changes. In relevant part, the final jury instructions included Instruction Number 25, related to venue in a conspiracy case:

> Now, some of the events that you have heard about happened in other places. There is no requirement that the entire conspiracy take place here in the Eastern District of Kentucky. But for you to return a guilty verdict on any charge, the government must convince you that venue is proper in the Eastern District of Kentucky.
>
> Unlike all the other elements that I have described, this is just a fact that the government only has to prove by a preponderance of the evidence. For the conspiracy charge (Count 1), this means that the government only has to convince you that it is more likely than not that either the agreement, or one or more of the acts in furtherance of the conspiracy, took place in the Eastern District of Kentucky.
>
> For the counts charging distribution of a controlled substance, or possession of a controlled substance with the intent to distribute it (Counts 2-5), this means that the government only has to convince you that it is more likely than not that the controlled substance was possessed in the Eastern District of Kentucky. And for each of the firearm charges (Counts 6 and 7), this means that the government only has to convince you that it is more likely than not the firearm was possessed in the Eastern District of Kentucky. Remember that all the other elements I have described must be proved beyond a reasonable doubt.

This largely followed the instruction proposed by the Government. The next day, after closing arguments and out of the presence of the jury, the court asked whether counsel had any objections to the proposed jury instructions. None were raised. The jury found Charles and Vassor guilty on all counts.

*2. Sentencing*

Prior to sentencing, the district court held an evidentiary hearing. In relevant part, Vassor renewed his objections to the presentence report's (PSR's) drug quantity calculation under USSG § 2D1.1(c)(1), as well as the application of the USSG § 2D1.1(b)(1) firearms enhancement. The court overruled the objections. At sentencing, Charles's counsel objected to the attribution of "15 pounds or more" of methamphetamine that was based on Sloan's testimony, though he also acknowledged that "[u]ltimately, the guideline range appears to be the same." Vassor's counsel renewed the objections to the firearm enhancement and drug quantity, arguing that the Government failed to prove that Vassor possessed the firearms in Charles's home or to substantiate the drug quantity by a preponderance of the evidence.

The court evaluated "the drug quantities" in the PSR and determined that "even if I were to sustain the objection as to the fentanyl and the 15 pounds of methamphetamine . . . the base offense level would remain at level 38." It concluded that Charles and Vassor "were using [Charles's home] jointly," and characterized the residence "as a stash house." On these bases, the court attributed "direct knowledge" of both "the drugs" and "the firearms" at Charles's residence to Vassor.

The court also responded to Vassor's objection to "the 15 pounds attributed to the defendants during the period October through December of 2020" and the fentanyl recovered from Charles's house. Acknowledging the objection, the court stated its belief that "if we subtract both of those numbers, we still have over 90,000 kilograms," and asked the Government whether this would affect the base offense level of 38. The Government responded that excluding those contested drug amounts "won't impact the base offense level of 38" because "we're well above the threshold for the converted drug weight."

To calculate the amount of drugs for which Vassor was responsible, the court determined that "about 10 and a third pounds" of drugs applied to the three-month conspiracy period. "[E]xercising caution," the court cut the amount to "5 pounds rather than 15 pounds," calculating the resulting drug quantity as "approximately 4,500 kilograms." Concluding that the resulting amount would still exceed "95,000 kilograms even if that amount is reduced by one-third of the amount that's attributed to the defendant; five pounds versus 15 pounds," the court calculated the base offense level as 38. It also overruled Vassor's objection to the firearm enhancement, adopted the findings of the PSR, and sentenced Vassor to a total term of 320 months' imprisonment. The court sentenced Charles to a total of 380 months' imprisonment.[2] Charles and Vassor timely appealed.

## II. ANALYSIS

This court has jurisdiction over the appeals of Charles and Vassor pursuant to 28 U.S.C. § 1291. Likewise, 18 U.S.C. § 3742(a) authorizes Vassor's appeal of his sentence to this court. We address each of the issues in turn below.

### A. Sufficiency of evidence of a conspiracy

"This court reviews denials of motions for acquittal de novo." *United States v. Walker*, 734 F.3d 451, 455 (6th Cir. 2013) (italics omitted). In doing so, we "must construe the evidence in the light most favorable to the government." *United States v. Clay*, 667 F.3d 689, 693 (6th Cir. 2012). "[A]n appellate court's reversal for insufficiency of the evidence" rests on the conclusion "that the government's case against the defendant was so lacking that the trial court should have entered a judgment of acquittal, rather than submitting the case to the jury." *United States v.*

---

[2] Charles did not challenge his sentence in his opening brief, however, in his reply brief, Charles "adopts the arguments made by Vassor" regarding the improper sentencing calculation because "[t]he same calculation . . . was applied to Charles." We decline to consider those waived arguments.

*Wettstain*, 618 F.3d 577, 583 (6th Cir. 2010) (alteration in original) (quoting *Lockhard v. Nelson*, 488 U.S. 33, 39 (1988)). "A defendant claiming insufficiency of the evidence bears a very heavy burden," because "[c]ircumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt." *United States v. Jenkins*, 345 F.3d 928, 940 (6th Cir. 2003) (internal quotation marks omitted) (quoting *United States v. Stines*, 313 F.3d 912, 919 (6th Cir. 2002)). Our inquiry is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

Still, "mere suspicion cannot sustain a verdict of guilt beyond a reasonable doubt." *Jenkins*, 345 F.3d at 942 (collecting cases). Though "[a] tacit or mutual understanding among the parties is sufficient" to demonstrate a conspiracy, *United States v. Forrest*, 17 F.3d 916, 918 (6th Cir. 1994), "the evidence must nevertheless demonstrate that the defendant had knowledge of the conspiracy's object and consciously committed himself to the furtherance of that object," *United States v. Caver*, 470 F.3d 220, 233 (6th Cir. 2006).

A conspiracy requires three elements:

(1) An object to be accomplished. (2) A plan or scheme embodying means to accomplish that object. (3) An agreement or understanding between two or more of the defendants whereby they become definitely committed to cooperate for the accomplishment of the object by the means embodied in the agreement, or by any effectual means.

*United States v. Gibbs*, 182 F.3d 408, 420 (6th Cir. 1999) (quoting *United States v. Bostic*, 480 F.2d 965, 968 (6th Cir. 1973)).

In the context of a drug conspiracy, the government must prove "(1) an agreement by two or more persons to violate the drug laws, (2) knowledge and intent to join in the conspiracy, and

(3) participation in the conspiracy." *United States v. Paige*, 470 F.3d 603, 608 (6th Cir. 2006). We have long recognized that "to prove a single conspiracy, the government must show that each alleged member agreed to participate in what he knew to be a collective venture directed toward a common goal." *United States v. Warner*, 690 F.2d 545, 549 (6th Cir. 1982) (quoting *United States v. Martino*, 664 F.2d 860, 876 (2d Cir. 1981)). The "critical element" is "that the conspiracy involve more than an agreement to transfer drugs from one party to another." *United States v. Wheat*, 988 F.3d 299, 309 (6th Cir. 2021). Moreover, "[a]lthough only 'slight' evidence is needed to connect a defendant to a conspiracy, 'mere association with conspirators is not enough to establish participation in a conspiracy.'" *Gibbs*, 182 F.3d at 422 (quoting *United States v. Pearce*, 912 F.2d 159, 162 (6th Cir. 1990)). Put differently, "the government must show the willful formation of a conspiracy and the willful membership of the defendant in the conspiracy." *United States v. Layne*, 192 F.3d 556, 567 (6th Cir. 1999).

Our cases distinguish between a scenario where "a willing seller and buyer agree to the exchange of drugs for the buyer's use," which is not a conspiracy, and "[d]istribution schemes," "often involv[ing] 'chain' conspiracies in which a wholesaler sells to a retailer and the two have reached an agreement that the retailer will resell to end users," which are conspiracies. *Wheat*, 988 F.3d at 307-08. Our approach coheres with that of sister circuits, all of which "have adopted some form of a 'buyer-seller' rule that refuses to equate a buyer-seller agreement with a conspiratorial 'agreement.'" *Id.* at 307. This understanding comports with "a common-law rule of conspiracy (Wharton's Rule)," which "holds that two parties cannot conspire to commit a substantive crime when the crime itself requires two parties for its completion (such as dueling or prostitution)" or drug distribution. *Id.* at 307, 308 (emphasis omitted).

"In § 846 conspiracy cases," we have held that "circumstantial evidence that may establish that 'a drug sale is part of a larger drug conspiracy' includes advance planning, ongoing purchases or arrangements, large quantities of drugs, standardized transactions, an established method of payment, and trust between the buyer and seller." *United States v. Sadler*, 24 F.4th 515, 539 (6th Cir. 2022) (quoting *United States v. Williams*, 998 F.3d 716, 728 (6th Cir. 2021)); *see also Wheat*, 988 F.3d at 308-09 (discussing facts that can allow a jury to infer the existence of a conspiracy); *United States v. Martinez*, 430 F.3d 317, 334 (6th Cir. 2005) (holding that a defendant's connection to a conspiracy "can be inferred from evidence that he was involved in repeat drug transactions with members of the conspiracy").

*Sadler* illustrates the distinction between a buyer-seller relationship and a conspiracy agreement. That case concerned a sophisticated "drug dealing system" in Detroit known to customers as "Polo." *Sadler*, 24 F.4th at 528. Polo enabled customers to "buy heroin and crack cocaine at all hours of the day and night by calling one of two different phone numbers and going to a set location where they would meet someone to buy drugs." *Id.* At trial, the government introduced testimony from ten customers, some of whom purchased "drugs from 'Polo' . . . hundreds of times, and often multiple times a day," *id.* at 529; evidence from undercover drug purchases, *id.* at 530; laboratory tests on drugs purchased through Polo, *id.* at 530-31; and evidence from four drug overdoses implicating Polo, *id.* at 531-34. On appeal, we determined that this evidence—including customers' repeated purchases from Polo, which "often" amounted to "hundreds of times over the course of three to four years"; the "standardized" nature of the sales, including "nearly identical procedures" for each sale; the "large quantities of drugs" processed by Polo; and the consistent method of payment and cost of drugs—was sufficient to show "that each

'Polo' drug deal was 'part of a larger drug conspiracy.'" *Id.* at 539-40 (quoting *Williams*, 998 F.3d at 728).

Here, Charles and Vassor argue that the Government introduced insufficient evidence for a jury to convict them of conspiracy. The Government responds that the conspiracy was an agreement between Charles, Vassor, and Cloyd "to distribute pound quantities of methamphetamine that were intended for further distribution." With respect to structure, the Government asserts that "Charles was the head of the conspiracy who supplied pound quantities of methamphetamine to Vassor and Cloyd for redistribution." Describing the "evidence of a conspiracy" as "overwhelming," the Government attributes the convictions to the jury crediting the testimony of Cloyd and Sloan regarding their alleged roles in the conspiracy "as truthful." We address each defendant's sufficiency of the evidence challenge below.

### 1. Charles

#### a. Sufficiency of the evidence

Charles concedes that the Government "proved [he] possessed methamphetamine with the intent to distribute" by arresting Charles en route to the June 8, 2021 controlled buy, but disputes that the Government proved he operated as part of a conspiracy. In particular, he urges that the Government's reliance on Vassor's June 8 statement to Sloan that he called Charles and learned "Charles was in Frankfort with his son and [would] call Sloan back at 4:00 p.m." is misplaced because the Government apparently "never confirmed whether the phone call was actually placed." "At best," Charles contends, "the government has demonstrated proof of two different conspiracies," resulting in a variance between the charges in the indictment and those for which the jury convicted him.

Charles's arguments regarding Vassor's discussion with Sloan rest on credibility determinations. The jury was entitled to believe Vassor's recorded statements, and we cannot disturb the jury's credibility determinations on appeal. *See Paige*, 470 F.3d at 608.

b. Variance

"A variance to the indictment occurs when the charging terms of the indictment are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment." *Caver*, 470 F.3d at 235. In a conspiracy case, "a variance constitutes reversible error only if a defendant demonstrates that he was prejudiced by the variance and that the 'indictment allege[d] one conspiracy, but the evidence can reasonably be construed *only* as supporting a finding of multiple conspiracies.'" *Id.* at 235-36 (alteration in original) (quoting *Warner*, 690 F.2d at 548). Under this analysis, the evidence must be viewed "in the light most favorable to the government." *Id.* at 236. Put differently, the question on appeal is whether "the evidence" presented at trial "exclude[s] the possibility that Defendants were part of a single conspiracy." *Id.*

We "review the question of whether a variance has occurred de novo." *United States v. Swafford*, 512 F.3d 833, 841 (6th Cir. 2008) (italics omitted). Where, as here, a defendant fails to allege a variance at trial and raises the issue for the first time on appeal, plain error review applies. *Id.* Failure to provide evidence "that each alleged member" of the conspiracy "agreed to participate in what he knew to be a collective venture directed toward a common goal" can constitute plain error. *Id.* (quoting *Warner*, 690 F.2d at 549). "[F]or the variance to constitute reversible error, a defendant must at the very least show that this variance prejudiced him." *Id.* at 842. Prejudice can occur due to "the spillover problem," where "the factfinder mistakenly believes there is a union of interest and criminal intent and an agreement to coordinate activity," thus leading to a "distributive application of evidence [that] diminishes the level of proof necessary for convictions

based on the multiple conspiracy theory proven at trial." *Id.* at 843. Such application renders it "impossible to say that the variance did not affect the outcome of the trial," thereby necessitating that the conviction be overturned. *Id.* at 843-44.

Charles's variance argument warrants close inspection. On the one hand, the distribution-quantity of drugs exchanged is consistent with a single conspiracy. *Sadler*, 24 F.4th at 539 (emphasizing that "large quantities of drugs" can serve as "circumstantial evidence" of a conspiracy). Likewise, the fact that Charles at times "fronted" Cloyd methamphetamine and allowed Vassor to live in his home, drive his partner's vehicle, and ostensibly access the drugs stored in the home, reflect a level of "trust" that may be associated with a conspiracy. *Id.*

On the other hand, some facts undermine this conclusion. The relatively limited temporal duration (months instead of years), lack of sophistication or standardization of operations, and paucity of evidence regarding end-use customers distinguish this case from *Sadler*. In these respects, the facts presented here arguably resemble the circumstances in *Kotteakos v. United States*, 328 U.S. 750, 755 (1946), which stands for the proposition that "'without the rim of the wheel to enclose the spokes,' a single, wheel conspiracy cannot exist but instead is a series of multiple conspiracies between the common defendant and each of the other defendants." *Swafford*, 512 F.3d at 842 (quoting *Kotteakos*, 328 U.S. at 755).

Notwithstanding these concerns, however, the record before us "does not exclude the possibility that Defendants were part of a single conspiracy." *Caver*, 470 F.3d at 236. Crediting Sloan and Cloyd's testimony, a jury could reasonably conclude that Charles, Vassor, and Cloyd entered into a conspiracy to sell methamphetamine because nothing in the record indicates that any of these three purchased drugs for their own use from one another. The buyer-seller exception also does not apply. *See Wheat*, 988 F.3d at 307. Testimony that Charles provided drugs to Cloyd

and Vassor for further distribution, and Vassor's recorded statement to Sloan that he would "grab" some methamphetamine from the "house"—a reference to Charles's home—interpreted in the light most favorable to the Government, support an inference that Charles conspired with Cloyd and Vassor to distribute methamphetamine and supplied them with methamphetamine for that purpose. We therefore affirm Charles's conviction.

2. *Vassor*

Vassor challenges the sufficiency of the Government's proof of conspiracy on several grounds. He submits that the Government relies on "pure speculation" to demonstrate that he knew of the drugs in Charles's basement. Next, Vassor argues that the Government produced "no evidence" that he lived with Charles in Kentucky, emphasizing that the Government introduced "no videos or still shots showing Mr. Vassor to be a regular, overnight house guest at Mr. Charles's residence." "[N]o one testified as to what took place in Mr. Charles's house, whether Mr. Vassor was present or not," Vassor urges, stressing that "[e]vidence beyond a reasonable doubt" must "mean something more than speculation."

Here, the jury was entitled to credit Sloan's testimony that he believed Charles and Vassor operated as "partners." Sloan's testimony is supported by: evidence that Vassor resided at Charles's house and often drove a car belonging to Charles's romantic partner while in Lexington; Vassor's recorded statements to Sloan that he would "grab" some methamphetamine from Charles' house in connection with the February 8 controlled purchase and would connect Sloan with "his boy" on June 8 after 4:00 p.m.; and the evidence that Charles reached out to Sloan at 5:00 p.m. that day to arrange the sale of three pounds of methamphetamine. Based on the totality of the evidence, a jury could reasonably conclude that Charles and Vassor occupied "the same horizontal level of distribution," and that they comprised "part of a single 'chain' conspiracy." *Caver*, 470

F.3d at 236. The trial evidence went beyond mere speculation. For these reasons, and substantially the same reasons as those analyzed in relation to Charles, we affirm Vassor's conviction for conspiracy.

We pause briefly to acknowledge that nowhere in the record did the Government provide any direct evidence of a conspiracy—either for Vassor or for Charles. Under our precedent, however, "the 'government may meet its burden of proof through circumstantial evidence,'" and the conspiracy "agreement can be tacit, not formal." *Williams*, 998 F.3d at 728 (first quoting *Layne*, 192 F.3d at 567). On this record, we cannot say that "after viewing the evidence in the light most favorable to the prosecution," as we must, no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. And, although Defendants offer alternative theories of the case, under the governing standard of review, those explanations do not unseat the one that the Government offered and the jury accepted. Bound as we are by *Jackson*'s highly deferential standard of review, 443 U.S. at 319, and our precedent on conspiracy, we affirm.

### B. Sufficiency of proof that Charles possessed a firearm in furtherance of a drug trafficking conspiracy

"[A]ny person who, during and in relation to any . . . drug trafficking crime . . . for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime" face enumerated heightened terms of incarceration. 18 U.S.C. § 924(c)(1)(A). "This statute creates two offenses. It covers both a person who 'uses or carries' a firearm 'during and in relation to' a crime of violence or drug-trafficking crime and a person who 'possesses' a firearm 'in furtherance of' such a crime." *United States v. Maya*, 966 F.3d 493, 499 (6th Cir. 2020) (quoting 18 U.S.C. § 924(c)(1)). Charles was

convicted of the possession offense. To show that the gun possession was "in furtherance of" a "crime of violence or drug trafficking crime," 18 U.S.C. § 924(c)(1), "the government must show a 'specific nexus between the gun and the crime charged.'" *United States v. Street*, 614 F.3d 228, 236 (6th Cir. 2010) (quoting *United States v. Mackey*, 265 F.3d 457, 462 (6th Cir. 2001)). Moreover, "[a]ny nexus must amount to more than possession during a drug crime, as the firearm must 'advance, promote, or facilitate the crime.'" *Id.* (quoting *Paige*, 470 F.3d at 609). Nexus is critical because "the possession of a firearm on the same premises as a drug transaction would not, without a showing of a connection between the two, sustain a § 924(c) conviction." *Mackey*, 265 F.3d at 462. But "if the firearm is 'strategically located so that it is quickly and easily available for use,' that is sufficient." *United States v. Parker*, No. 22-6047, 2024 WL 464492, at *4 (2024) (quoting *Mackey*, 265 F.3d at 462); *see also Maya*, 966 F.3d at 501–02.

A nexus may be evidenced by the discovery of firearms in close proximity to the location where the defendant sold drugs and law enforcement later seized drugs and drug paraphernalia, as well as other indicators that the defendant relied on the seized firearms "for protection against robbery" and held the firearm during commission of drug sales. *Paige*, 470 F.3d at 609-10; *see also Mackey*, 265 F.3d at 462-63 (affirming sufficiency of evidence to sustain § 924(c) conviction where "there was an illegally possessed, loaded, short-barreled shotgun in the living room of the crack house, easily accessible to the defendant and located near the scales and razor blades" and "Defendant, stopped by police near the gun, possessed cocaine and a large sum of cash").

Charles raises two challenges to the sufficiency of the evidence supporting his conviction under 18 U.S.C. § 924(c). Building on his argument that the Government failed to meet its evidentiary burden as to the conspiracy charge, Charles contends that because he "was not part of a conspiracy, he could not have used a firearm in furtherance of a conspiracy." He also argues that

though the Government demonstrated that law enforcement discovered firearms during the search of Charles's home, "there was no proof Charles ever used a firearm in furtherance of a drug trafficking conspiracy."

Here, the Government found two loaded pistols on a shelf in Charles's bedroom closet. In the bedroom "just outside" the closet, law enforcement found $25,000 cash, a box of ammunition near the bed, and a paper bag containing pills near the ammunition. The basement of Charles's house contained narcotics in shoe boxes, a duffle bag, and a scale. On this record, the jury could find that Charles placed the pistols within easy reach of his bed to protect the cash, which a jury could infer represented the proceeds of his drug sales. *Paige*, 470 F.3d at 609-10; *see also Maya*, 966 F.3d at 502 (concluding that the Government presented sufficient evidence that defendant used a firearm to facilitate his drug trafficking conspiracy where evidence could support the conclusion that the defendant "kept his gun in his bed to protect the drug proceeds he used to purchase marijuana and continue the conspiracy"). Thus, because sufficient evidence existed for a jury to convict Charles of possessing a firearm in furtherance of drug trafficking, we affirm Charles's conviction.

### C. Sufficiency of the evidence that Charles possessed heroin and cocaine with intent to distribute

"Although specificity of grounds is not required in a Rule 29 motion, where a Rule 29 motion is made on specific grounds, all grounds not specified are waived." *United States v. Dandy*, 998 F.2d 1344, 1356-57 (6th Cir. 1993) (internal citation omitted). Similarly, where the district court "directly asked" counsel "whether he challenged the sufficiency of the evidence" as to a particular charge, and "counsel replied that he did not," we held that the defendant "waived his challenge to the sufficiency of the evidence" on those counts. *Id.* at 1357.

At the close of the Government's case, Charles moved "for dismissal of the charges against him," listing, "[s]pecifically . . . Count 3, charging violation of 21 U.S.C. 841" and "Count 4, charging violation of 21 U.S.C. § 841," the counts pertaining to possession with intent to distribute heroin and cocaine, respectively. Charles's counsel did "focus on the conspiracy charge"; however, the court did not ask for elaboration on the objections to counts 3 and 4, and Charles did not otherwise indicate an intention to abandon his challenge to those charges. We will assume without deciding that Charles did not waive his challenge to the sufficiency of the evidence on the heroin- and cocaine-related charges. *See United States v. Olano*, 507 U.S. 725, 733 (1993) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). We therefore reach the merits of Charles's arguments.

To prove that a defendant violated § 841(a)(1) by possessing controlled substances with intent to distribute, the government must demonstrate that "(1) the defendant knowingly, (2) possessed a controlled substance, (3) with intent to distribute." *United States v. Coffee*, 434 F.3d 887, 897 (6th Cir. 2006). "[A] large quantity of drugs, too large for personal use alone" can support the inference that the defendant intended to engage in distribution. *United States v. Jackson*, 55 F.3d 1219, 1226 (6th Cir. 1995). "[C]onstructive possession," which exists when a "a defendant had either (1) 'dominion or control over the item itself,' or (2) 'dominion over the premises where the item is located,'" is sufficient to establish a violation of § 841(a)(1). *United States v. Latimer*, 16 F.4th 222, 225 (6th Cir. 2021) (quoting *United States v. Wheaton*, 517 F.3d 350, 367 (6th Cir. 2008)); *see also Gibbs*, 182 F.3d at 424-25 (emphasizing that constructive possession is sufficient to sustain a § 841(a) conviction). "Like actual possession, constructive possession may be proved by circumstantial evidence." *United States v. Reed*, 141 F.3d 644, 651 (6th Cir. 1998).

Charles argues that there is a "complete lack of evidence showing Charles possessed the cocaine or heroin, or that Charles intended to distribute the drugs." He concedes, however, "that an intent to distribute can be inferred from the amounts of heroin and cocaine found in the residence." The Government urges that "[t]he large quantity of drugs, alone, would have been sufficient for the jury to conclude that Charles possessed these drugs with the intention to distribute them to others."

Possession of "large amounts of" drugs can provide a jury with sufficient evidence to convict a defendant of possessing drugs with the intent to distribute. *United States v. Castro*, 960 F.3d 857, 866 (6th Cir. 2020). To require the Government to also prove that the defendant "actually sold" the drugs at issue would "wrongly equate[] intent to distribute with actual distribution and ignore[] that intent can be proved through circumstantial evidence." *Id.* Detective Parke testified that the 200 grams of heroin and 200 grams of cocaine recovered from Charles's house were "distribution quantities," not "user quantities." The jury was entitled to rely on that testimony in the context of this record. We therefore affirm Charles's conviction on these counts.

**D. Testimony that Charles and Vassor were part of a Los Angeles "club"**

Federal Rule of Evidence 404(b) specifies that "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character"; however, such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(1)-(2). In criminal cases, a prosecutor must provide "reasonable notice of any such evidence" that he "intends to offer at trial, so that the defendant has a fair opportunity to meet it." Fed. R. Evid. 404(b)(3)(A). This

notice must take the form of a "writing before trial—or in any form during trial if the court, for good cause, excuses lack of pretrial notice." Fed. R. Evid. 404(b)(3)(C).

A trial court determines the admissibility of evidence under 404(b) using three steps: first, it considers whether there is sufficient proof that the other crime, wrong, or act occurred; second, it determines whether the proffered evidence is actually "probative of a material issue other than character"; third, the court must determine "whether the probative value of the evidence is substantially outweighed by its potential prejudicial effect." *Jenkins*, 345 F.3d at 937. This court evaluates the first step of the trial court's 404(b) analysis for clear error, its legal determination at the second step de novo, and its determination that the probative value is not substantially outweighed by the potential for unfair prejudice for abuse of discretion. *United States v. Jobson*, 102 F.3d 214, 220 (6th Cir. 1996).

When evidence has been improperly admitted, we review the denial of a motion for a mistrial for abuse of discretion. *Caver*, 470 F.3d at 243. To determine whether an improperly admitted witness statement requires a mistrial, this court considers five factors, derived from *Forrest*:

> (1) whether the remark was unsolicited, (2) whether the government's line of questioning was reasonable, (3) whether a limiting instruction was immediate, clear, and forceful, (4) whether any bad faith was evidenced by the government, and (5) whether the remark was only a small part of the evidence against the defendant.

*Caver*, 470 F.3d at 243 (quoting *Zuern v. Tate*, 336 F.3d 478, 485 (6th Cir. 2003)). Examples of improper statements can include "[a]ppeals to racial or ethnic prejudice," which "violate a defendant's Fifth Amendment right to a fair trial." *United States v. You*, 74 F.4th 378, 390 (6th Cir. 2023) (citing *McCleskey v. Kemp*, 481 U.S. 279, 309 n.30 (1987)). If such improper

statements "'substantial[ly] influence[d]' the outcome of a trial, a new trial is needed." *Id.* (alterations in original) (quoting *United States v. Grey*, 422 F.2d 1043, 1046 (6th Cir. 1970)).

Charles argues that "Sloan's testimony that Charles and Vassor were in 'some kind of club out there in California' clearly suggested the men are in a gang." This suggestion, Charles avers, was prejudicial, irrelevant, and "misled the jury into believing the two men were part of the same organization." Vassor joins in these arguments, adding that "this type of evidence" "implicitly" relates to the fact that Vassor and Charles are Black, thereby violating their right to a fair trial.

Here, defense counsel did not raise a Fifth Amendment argument before the trial court. "The law in this circuit is clear that the failure to raise a constitutional challenge before the district court results in plain error review." *United States v. Doxey*, 833 F.3d 692, 709 (6th Cir. 2016). On appeal, Vassor confined his Fifth Amendment argument to a single paragraph, in which he made no effort to show, as is required, that any error was "clear or obvious." *United States v. Soto*, 794 F.3d 635, 655 (6th Cir. 2015) (citation omitted). For these reasons, we decline to address his Fifth Amendment argument.

References to a defendant's alleged gang membership still implicate Rule 404(b) concerns. As this court recognized, because "[m]ost jurors . . . are likely to look unfavorably upon the joining of a street gang," "Rule 404(b) probably ought to govern evidence of a defendant's gang membership where membership is not in fact necessary to prove an element or ultimate fact of the crime charged." *Jobson*, 102 F.3d at 219 n.4.

Here, none of the charges against Vassor and Charles required the Government to prove gang affiliation. Thus, Sloan's statement that the men belonged to "some kind of club out there in California," reasonably interpreted as a euphemism for gang membership, may have triggered Rule 404(b). Defense counsel raised the 404(b) objection. The court ruled that the statement was not

404(b) evidence requiring disclosure because Sloan's statement arose in the context of explaining why the Government paid his relocation expenses. We can assume without deciding that the statement was improperly admitted because, either way, a mistrial was not required.

We now turn to the *Forrest* factors. First, solicitation. In a technical sense, the Government did "solicit" Sloan's testimony, *Caver*, 470 F.3d at 243, by asking him if he "ha[d] any concerns for [his] safety." But the Government's question about safety was open-ended, rather than a tailored question that might reasonably induce a witness to opine on alleged gang affiliation (such as asking about alleged membership in a club or violent organization). Counsel, moreover, posed the question after the court instructed the parties that counsel "c[ould] ask if [Sloan] had concerns."

The second factor, the reasonableness of the Government's questioning, *Caver*, 470 F.3d at 243, also weighs against a mistrial because it served to rehabilitate Sloan's credibility before the jury by providing a valid reason for his receipt of government funds. Third, the court did not offer any limiting instruction, *id.*, but defense counsel did not request a limiting instruction at trial, nor do they urge on appeal that the district court erred in declining to offer one. Precedent does not indicate that the lack of a limiting instruction is dispositive, and the other factors weigh in favor the Government. As to factors four and five, the record does not indicate bad faith on the part of the Government. *Id.* The statement's brevity and lack of further allusion to Vassor and Charles's alleged membership in "some club" likewise suggests that Sloan's "remark was only a small part of the evidence against the defendant[s]." *Caver*, 470 F.3d at 243. Thus, applying the *Forrest* factors, we affirm the denial of a mistrial.

### E.  Jury instructions

"[T]he legal accuracy of jury instructions" is subject to de novo review. *United States v. Blanchard*, 618 F.3d 562, 571 (6th Cir. 2010). "This court 'must review jury instructions as a

whole in order to determine whether they adequately inform the jury of the relevant considerations and provide a sound basis in law to aid the jury in reaching its decision.'" *United States v. Fisher*, 648 F.3d 442, 447 (6th Cir. 2011) (quoting *United States v. Clark*, 988 F.2d 1459, 1468 (6th Cir. 1993)). Conformity with "the pattern jury instructions" serves "as one factor in determining whether any particular instruction is misleading or erroneous." *United States v. Frei*, 995 F.3d 561, 565 (6th Cir. 2021) (quoting *United States v. Damra*, 621 F.3d 474, 499-500 (6th Cir. 2010)).

"[U]npreserved objections to jury instructions" are reviewed "for plain error." *You*, 74 F.4th at 391. Qualifying for reversal under this standard requires (1) "error that (2) was plain, (3) affected a substantial right, and (4) 'seriously affects the fairness, integrity, or public reputation of judicial proceedings.'" *United States v. Martin*, 520 F.3d 656, 658 (6th Cir. 2008) (quoting *United States v. Oliver*, 397 F.3d 369, 378 (6th Cir. 2005)). "An error affects a defendant's substantial rights when it 'creates a "reasonable probability" that the flawed . . . jury instruction led to a flawed conviction.'" *You*, 74 F.4th at 392 (alteration in original) (quoting *United States v. Henry*, 797 F.3d 371, 375 (6th Cir. 2015)).

Vassor contends that the instructions for the possession with intent to distribute charges were improper. He argues that the language used "means that the government only has to convince you that it is more likely than not that the controlled substance was possessed in the Eastern District of Kentucky," because "if the possession with intent to distribute could only have occurred in Kentucky given the facts, the jury could have ended up convicting Mr. Vassor on count 5 on a mere preponderance of the evidence."[3] The Government responds that the Defendants cannot

---

[3] Charles did not challenge the instructions in his opening brief; however, in his reply brief, Charles adopted this argument. We decline to consider his waived argument.

satisfy plain error because "[t]he instruction accurately set forth the government's burden of proof," and in any event, any error was harmless.

Neither Vassor nor Charles objected to this instruction before the trial court, so plain error review applies. The instruction accurately established that "[t]he United States must prove by a preponderance of the evidence that venue was proper as to each count." *United States v. Crozier*, 259 F.3d 503, 519 (6th Cir. 2001). Reviewing the "instructions as a whole," *Fisher*, 648 F.3d at 447 (citation omitted), confirms that the instructions repeatedly emphasized that if the jurors possessed "a reasonable doubt about any one of" the elements of each count, then they "must find the defendant not guilty of [the] charge." Indeed, consistent with the Sixth Circuit's Pattern Jury Instructions, *see* Pattern Crim. Jury Instr. 6th Cir. 1.03 (2023), the court's third instruction to the jury outlined the presumption of innocence, burden of proof, and definition of reasonable doubt. This instruction clarified that "[t]he government must prove every element of the crimes charged beyond a reasonable doubt." The venue instruction later reminded jurors "that all the other elements [the court has] described must be proved beyond a reasonable doubt." This record does not evince any error, let alone a plain error affecting the "substantial right[s]" of the defendants that "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Martin*, 520 F.3d at 658 (quoting *Oliver*, 397 F.3d at 378). Because the jury instructions were not plainly erroneous, we affirm Vassor's and Charles's convictions.

## F. Procedural reasonableness of Vassor's sentence

All sentencing proceedings must start with a correct calculation of the appropriate Guidelines range. *Gall v. United States*, 552 U.S. 38, 49 (2007). Procedural unreasonableness results when "the district court fails to calculate (or improperly calculates) the Guidelines range, treats the Guidelines as mandatory, fails to consider the § 3553(a) factors, selects a sentence based

on clearly erroneous facts, or fails to adequately explain the chosen sentence." *United States v. Baker*, 559 F.3d 443, 448 (6th Cir. 2009). "Preserved objections to fact-findings" are subject to "a deferential clear-error standard," while "[l]egal questions, such as the interpretation of the Guidelines" are "review[ed] de novo." *United States v. Smith*, 79 F.4th 790, 794 (6th Cir. 2023).

"[I]f a district court commits procedural error, the sentence will not be vacated if the error was harmless," which can be based on the court's indication that "it would have imposed the same sentence regardless of the procedural error." *United States v. Gates*, 48 F.4th 463, 470 (6th Cir. 2022). It is the Government's burden "to prove 'with certainty' that the district court would have imposed the same sentence had the Guidelines been properly calculated." *Id.* at 471 (quoting *United States v. Rosales*, 990 F.3d 989, 1000 (6th Cir. 2021)); *see also United States v. Gillis*, 592 F.3d 696, 699 (6th Cir. 2009).

Vassor raises arguments challenging his sentence that fall into two general categories: objections to the sentencing court's reliance on the Sentencing Guidelines' Commentary, and errors with the calculation of his sentence.[4]

### 1. Reliance on the Sentencing Guidelines' Commentary

Application of the Guidelines' Commentary has been subject to "the framework set forth in *Kisor v. Wilkie*, [588] U.S. [558], 139 S. Ct. 2400 (2019)." *You*, 74 F.4th at 397 (quoting *United States v. Phillips*, 54 F.4th 374, 379 (6th Cir. 2022)). Assuming that framework is not altered by the Supreme Court's recent decision in *Loper Bright Enterprises v. Raimondo*, 603 U.S. __, 2024 WL 3208360, at *22 (U.S. June 28, 2024), we defer to an agency's interpretation of its own

---

[4] In his reply brief, Charles attempted to adopt Vassor's arguments regarding the impropriety of the district court's sentencing calculation. This court has "consistently held . . . that arguments made . . . for the first time in a reply brief are waived." *Sanborn v. Parker*, 629 F.3d 554, 579 (6th Cir. 2010). Charles therefore waived any challenge to his sentencing calculation by failing to raise it in his opening brief.

regulation when the regulation remains "'genuinely ambiguous' after [this court] 'exhaust[s] all the "traditional tools" of construction,' including analyzing the regulation's 'text, structure, history, and purpose.'" *Id.* (quoting *Kisor*, 139 S. Ct. at 2415-17). Here, the regulation is the Guidelines, and the interpretation is contained in the Commentary. If the Guideline's language is ambiguous, we defer to the Commentary if it "fall[s] within the [Guideline's] 'zone of ambiguity'" and we determine that "the 'character and context' of the reading entitle it to deference." *Id.* (quoting *Kisor*, 139 S. Ct. at 2415-17). If the Guideline's language is unambiguous, then its plain terms are applied without deference to the Commentary. *See United States v. Riccardi*, 989 F.3d 476, 483 (6th Cir. 2021) (quoting *United States v. Stubblefield*, 682 F.3d 502, 510 (6th Cir. 2012)) ("No interpretive rule allows [this court] to depart from the plain text when we find it 'unreasonable.'"). "Courts presume that an undefined" term—including one used in a Sentencing Guideline—"comes with its ordinary meaning, not an unusual one." *Id.* at 488.

At issue here, Application Note K in the Guidelines defines "'Converted Drug Weight'" as "a nominal reference designation that is used as a conversion factor in the Drug Conversion Tables set forth in the Commentary below, to determine the offense level for controlled substances that are not specifically referenced in the Drug Quantity Table or when combining differing controlled substances." U.S.S.G. § 2D1.1(c) cmt. n. (K). Vassor argues that deference to the Commentary's Drug Conversion Table is unwarranted because the Guidelines' term "Converted Drug Weight" "contains no meaningful guidance on how courts should calculate [it], and instead expressly delegates to [the Sentencing Commission] the ability to define the phrase however it wishes through the [Commentary]." The Government responds that Sixth Circuit precedent forecloses Vassor's argument.

Vassor lays out a thoughtful argument, but we need not address it because any error was harmless. Here, the district court relied on the Drug Conversion Tables to calculate a single converted drug weight based on different amounts of actual methamphetamine, a mixture or substance containing methamphetamine, and fentanyl. Critically, though, the 4,511.67 grams of actual methamphetamine based on Cloyd's testimony exceeds the 4.5 kilograms of actual methamphetamine that triggers the maximum base offense level of 38 under § 2D1.1(c)(1). Thus, any error in deferring to the Drug Conversion Tables was harmless. *See, e.g.*, *United States v. Woodside*, 895 F.3d 894, 901 (6th Cir. 2018) (finding any error in determining the relevant drug quantity harmless because the defendant "would still have been sentenced according to the same base-offense level under any conceivable estimate" of the drug quantity).

### 2. *Drug quantity calculation*

A district court's drug quantity calculation is subject to clear error review. *United States v. Gardner*, 32 F.4th 504, 524 (6th Cir. 2022). In the context of drug crimes, the quantity and type of drugs involved in the crime of conviction sets the defendant's base offense level. *United States v. McReynolds*, 964 F.3d 555, 562 (6th Cir. 2020); *see also* USSG § 2D1.1(c) (providing the drug quantity table outlining the base offense level for specified quantities of enumerated controlled substances). That includes consideration of all "relevant conduct," which, in the context of "a jointly undertaken criminal activity," such as a conspiracy, means:

> [A]ll acts and omissions of others that were . . . (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity . . . that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.

USSG § 1B1.3(a)(1)(B).

Ordinarily, a court may calculate the defendant's base offense level using drug quantities associated with a defendant's relevant conduct, even if those quantities exceed those involved in the offense of conviction. *McReynolds*, 964 F.3d at 562-63. This assessment requires the court to "make two particularized findings: (1) that the acts were within the scope of the defendant's agreement; and (2) that they were foreseeable to the defendant." *Id.* at 563 (quoting *United States v. Campbell*, 279 F.3d 392, 399-400 (6th Cir. 2002)). To hold a defendant responsible for "'conspiracy-wide drug amounts' at sentencing," a court must make "particularized findings" explaining its decision. *Id.* at 564. Such findings need not be based on "explicit statements from a defendant," and "a district court need make only a 'reasonable estimate' [of the drug quantity] based on the record," rather than calculate the exact amount. *Gardner*, 32 F.4th at 525 (quoting *United States v. Tisdale*, 980 F.3d 1089, 1096 (6th Cir. 2020)). Physical evidence or testimony at trial can supply the basis for the court's estimate. *United States v. Jeross*, 521 F.3d 562, 570 (6th Cir. 2008). We apply a highly deferential review to the district court's determination of a witness's credibility. *Id.* When "two permissible views of the evidence exist" or the sentencing court's drug quantity estimate "is supported by competent evidence in the record," we will uphold a district court's drug quantity calculation. *Id.*

Though highly deferential, this standard is not boundless. Evaluating the conspiracy's "scope" depends on "six factors: '(1) the existence of a single scheme; (2) similarities in modus operandi; (3) coordination of activities among schemers; (4) pooling of resources or profits; (5) knowledge of the scope of the scheme; and (6) length and degree of the defendant's participation in the scheme.'" *United States v. McReynolds*, 69 F.4th 326, 332 (6th Cir. 2023) (quoting *United States v. Donadeo*, 910 F.3d 886, 895-96 (6th Cir. 2018)).

Vassor argues that the court erred in holding him accountable for drugs attributable to his coconspirators. The jury convicted Vassor of conspiring with Charles to distribute methamphetamine; therefore, the PSR found Charles and Vassor jointly responsible for the drug quantities seized from Charles's home as well as the "historical quantities of methamphetamine" attributable to the sales "from October through December 2020." The district court found Vassor had "direct knowledge" regarding the drugs at the residence, "including the fentanyl," and that these drugs were "properly attributed to both" Charles and Vassor. Additionally, the court found that the 15 pounds of methamphetamine sold between October through December 2020 constituted "relevant conduct." On this record, the court's findings were not clearly erroneous, and the court did not legally err in its application of § 1B1.3(a)(1)(B).

Next, Vassor argues that the district court made "math errors" when it calculated the drug quantity. The PSR calculated the drug weight of actual methamphetamine as 4,511.67 grams based on the three controlled buys, traffic stop of Charles, and search of Charles's home. Adding the 15 pounds of a mixture or substance of methamphetamine from October through December 2020, the PSR calculated a converted drug weight of 104,259.472 kilograms.

In "exercising caution but making a reasonable calculation," the district court held each defendant accountable for five pounds, not 15 pounds, concluding that this quantity "would still exceed the 90,000 kilogram total necessary to place the defendants in the base offense level of 38." The court's calculations are not a model of clarity, but they do not rise to the level of impropriety. Moreover, even excluding all of the drugs exchanged between October through December 2020 and the fentanyl discovered at Charles's home, the drug quantity calculated based on Cloyd's testimony controls, resulting in 4,511.67 grams (or 4.51167 kilograms) of actual

methamphetamine. This exceeds the 4.5 kilograms of actual methamphetamine that triggers the maximum base offense level of 38 under § 2D1.1(c)(1).

The district court undertook to accurately calculate the drug amounts involved based on record evidence. However, the amount of methamphetamine attributable to Vassor based on Cloyd's testimony set his base offense level at 38. Any error in the court's math was harmless because it did not—and indeed, could not—change Vassor's base offense level of 38, as the parties recognized at sentencing. *See*, *e.g.*, *Jeross*, 521 F.3d at 575-76 (determining that alleged errors in sentencing calculation were harmless where the court applied "the very same base offense level . . . both initially and at resentencing" and "[n]othing in the record . . . suggests that the district court would have" otherwise ordered a lesser sentence). The court also verified the base level with the Government, at which point, defense counsel did not raise an objection. Thus, we affirm Vassor's sentence.

## III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the convictions of Charles and Vassor on all counts and **AFFIRM** both sentences as procedurally reasonable.