Eastern District of Kentucky
FILED

APR 21 2026

AT LEXINGTON
Robert R. Carr
CLERK U.S. DISTRICT COURT

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**CENTRAL DIVISION**
**LEXINGTON**

| | |
|---|---|
| JAMES GARFIELD CHARLES, | ) |
| | ) Civil No. 5:26-cv-_____ |
| Movant, | ) Crim No. 5:21-cr-00077-DCR-MAS-1 |
| | ) |
| vs. | ) **MEMORANDUM OF LAW IN** |
| | ) **SUPPORT OF MOTION UNDER** |
| UNITED STATES OF AMERICA, | ) **28 U.S.C. § 2255 TO VACATE, SET** |
| | ) **ASIDE, OR CORRECT SENTENCE** |
| Respondent. | ) |

COMES Movant, JAMES GARFIELD CHARLES ("Charles"), appearing *pro se,* and in support of this memorandum would show as follows:

## I. JURISDICTION

Charles is timely filing a Motion to Vacate, Set Aside, or Correct a Sentence by a Person in Federal Custody Pursuant to 28 U.S.C. § 2255 ("§ 2255 Motion") contemporaneously with this Memorandum of Law. Jurisdiction is vested in this District Court that presided over and imposed sentence pursuant to Rule 4(a) of the Rules Governing § 2255 Proceedings. See *Liteky v. United States,* 510 U. S. 540, 562 (1994). Under 28 U.S.C. § 2255, federal prisoners "claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States" may move the district "court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a).

## II. STATEMENT OF THE GROUNDS FOR REVIEW

A.   Whether, the Government committed Prosecutorial Misconduct.

B.   Whether pretrial counsel's failure to: (1) Communicate with Charles and correctly

1

inform him of the relevant circumstances and likely consequences of pleading guilty as opposed to proceeding to trial; (2) Conduct an adequate and independent pretrial investigation; and (3) Attempt to negotiate a favorable Plea Agreement deprived Charles of effective assistance of pretrial counsel under the Sixth Amendment of the Constitution of the United States.

C.      Whether, trial counsel's failure To: (1) Inform Charles of his strategy, any affirmative defenses and his theory of his defense; (2) Subpoena Critical Witnesses; and (3) Raise issues to help prove Charles' case.

D.      Whether sentencing counsel's failure to: (1) Adequately challenge the PSR; (2) Argue for mitigation of punishment and object to his sentence being substantively unreasonable; and (3) Failure to preserve meritorious issues for Appeal deprived Charles of effective assistance of sentencing counsel under the Sixth Amendment, a fair and just sentence.

## III. STATEMENT OF THE CASE

### A.      Procedural Background

On January 6, 2022, the grand jury sitting in the United States District Court for the Eastern District of Kentucky, Lexington Division, returned a seven (7) Count Superseding Indictment charging Charles and two other co-defendants. See Doc. 59.[1] Count 1s charged Charles with Conspiracy to Distribute 500 Grams or More of A Mixture or Substance Containing A Detectable Amount of Methamphetamine, in violation to 21 U.S.C. §§ 841(a)(1) and 846. *Id.* Count 2s charged Charles with Possession with Intent to Distribute 500 Grams or More of A Mixture or Substance Containing A Detectable Amount of Methamphetamine, in violation to 21 U.S.C. § 841(a)(1). *Id.*

---

[1]      "Doc." refers to the Docket Report in the United States District Court for the Eastern District of Kentucky, Lexington Division in Criminal No. 5:21-cr-00077-DCR-MAS-1, which is immediately followed by the Docket Entry Number.

Count 3s charged Charles with Possession with Intent to Distribute 100 Grams or More of A Mixture or Substance Containing A Detectable Amount of Heroin, in violation to 21 U.S.C. § 841(a)(1). *Id.* Count 4s charged Charles with Possession with Intent to Distribute A Mixture or Substance Containing A Detectable Amount of Cocaine, in violation to 21 U.S.C. § 841(a)(1). *Id.* Count 6s charged Charles with Possession of A Firearm In Furtherance of the Drug Trafficking Crime, in violation to 18 U.S.C. § 924(c)(1)(A). *Id.* Count 7s charged Charles with Felon in Possession of A Firearm, in violation to 18 U.S.C. § 922(g)(1). *Id.* The Superseding Indictment also contained Forfeiture Allegations, pursuant to 18 U.S.C. § 924(d), 21 U.S.C. § 853, and 28 U.S.C. § 2461. *Id.*

On January 18, 2022, a 3-day jury trial was held. See Docs. 73, 75, 76.

On January 20, 2022, the jury trial returned a guilty verdict as to Charles on Counts 1s, 2s, 3s, 4s, 6s, and 7s of the Superseding Indictment. See Doc. 82.

On May 6, 2022, Charles was sentenced to a total term of 380 months' imprisonment, 5 years of Supervised Release, no Fine or Restitution, and a Mandatory Special Assessment Fee of $600. See Docs. 98, 104, 124.

On May 12, 2022, Charles timely filed a Notice of Appeal. See Doc. 105.

On August 31, 2023, the United States Court of Appeals for the Sixth Circuit ("Sixth Circuit") affirmed the District Court's Judgment. See Docs. 161, 164, 166, 167, 170.

On March 21, 2025, Charles filed a Petition for Writ of Certiorari, which was denied by the United States Supreme Court on April 23, 2025. See Docs. 172,174.

**B.    Statement of the Relevant Facts**

1.    Offense Conduct

The government and Charles, through the advise of his counsel, agreed to the following:

Initially, the Government charged a third defendant, Tony Cloyd ("Cloyd"), with conspiracy; however, Cloyd ultimately pleaded guilty to drug trafficking and agreed to cooperate with the Government prior to trial. Zane Sloan ("sloan"), whom local police had investigated and charged in connection with selling methamphetamine, posed as a customer and orchestrated controlled buys of drugs involving Charles, Vassor, and Cloyd. Cloyd introduced Sloan to Charles in October 2020. Prior to becoming a government informant, Sloan estimated he purchased several pounds of drugs from Charles, buying methamphetamine "two or three times," typically purchasing one or two pounds, but "[a] few times" buying "eight or ten pounds."

During this period, Vassor was living in Los Angeles but commuted to Kentucky, residing in Lexington—ostensibly at Charles' home—for up to a month at a time. Sloan purchased drugs, including "cocaine and pills and different things," from Vassor "five or six times," mostly methamphetamine and "a little bit of heroin," approximately an "eight ball and maybe a quarter-ounce," for a total of approximately four to six pounds.

When Sloan ordered drugs from Vassor, Charles sometimes delivered them. Sloan also ordered drugs from Charles, initially through Cloyd, but later by contacting Vassor. Toward "the end" of the investigation period, however, Sloan called Charles directly to arrange drug transactions. According to Sloan, Charles, Vassor, and Cloyd became his exclusive sources for methamphetamine from October through December 2020. Cloyd testified that he "[n]ever" obtained drugs from Vassor, and "really didn't know [Vassor] to be involved in any of it," nor did he know where Vassor lived. Cloyd and Sloan never discussed Vassor.

Some of the transactions with Sloan involved guns. Sloan transferred guns to Vassor "two or three times," ranging from between one to "five, maybe six" guns in exchange for methamphetamine or money, for a total of "probably six, seven, [or] eight" guns. He sold Charles "one gun, maybe two."

From October through December 2020, Richmond Police conducted controlled buys of methamphetamine from Sloan, resulting in his arrest on New Year's Eve. Police also searched his home, seizing "14 ounces" of methamphetamine, a "gram of heroin," and a pound of marijuana that, according to Sloan, all came from Vassor. After his arrest, Sloan agreed to cooperate with law enforcement and help them identify drug suppliers "[u]p the chain."

4

While serving as an informant, in January 2021, Sloan contacted Cloyd looking for methamphetamine. Cloyd had never dealt methamphetamine, but he "called around" looking on Sloan's behalf. Cloyd eventually reached Robert Solomon, who "got ahold" of the drugs and met Cloyd, Charles, and Sloan to sell the latter "four to five pounds" of methamphetamine. Though Cloyd did not know from whom Solomon got the methamphetamine, Cloyd "assume[d] it came from [Charles]," but "never asked any questions." Cloyd obtained methamphetamine from Charles and sold it to Sloan an additional "time or two." In total, Cloyd called Charles to obtain drugs "[f]our to five" times, buying up to a pound each time. Sometimes Cloyd paid for the drugs on receipt, other times, Charles "front[ed]" the drugs to him, and Cloyd paid him later.

On January 7 and January 14, 2021, Sloan conducted two controlled buys from Cloyd that were supplied by Charles. A third controlled buy took place on February 8, when Vassor sold Sloan a pound of methamphetamine in a Target parking lot. Sloan secretly recorded the buy. The video shows Vassor agreeing to "run to" Charles' house to "grab" a pound of methamphetamine. A second video shows Sloan handing Vassor money for the methamphetamine and discussing the payment Sloan owed Vassor for prior transactions.

Sloan arranged for a final controlled buy of three pounds of methamphetamine from Charles on June 8. That morning, law enforcement conducted surveillance of Charles' home, and when he left, police pulled Charles over on Richmond Road. Officers seized the three pounds of methamphetamine from the backseat of his car.

That same day, police executed a search warrant for Charles' home, where they discovered almost $25,000 in cash, four pounds of methamphetamine, 200 grams of heroin, and 200 grams of cocaine, all of which (according to DEA Task Force Officer and Narcotics Detective Keith Parke) was worth between $70,000 to $75,000. Officers also found digital scales, baggies containing narcotics, ammunition, and 14 firearms.

See Doc. 164-1 at 2-4.

    2.    Trial Proceeding

On January 18, 2022, a 3-day jury trial was held before Judge Danny C. Reeves. See Doc. 73.

At trial, the Government called several witnesses, including the government agents who conducted the investigation, Sloan, and Cloyd. The agents testified to the amount and type of drugs and firearms seized during the investigation. Detective Keith Parke testified that he believed the pistols discovered

5

in Charles's bedroom served to protect Charles, the drugs he trafficked, and the proceeds of that trafficking.

Sloan testified that he bought drugs from both Charles and Vassor. He also testified about his gun sales to Charles and Vassor, and the alleged structure of the drug enterprise. When asked about the relationship between Charles and Vassor, Sloan testified that he believed they were "partners" because Vassor got his drugs from Charles, though Sloan admitted that "[Vassor] didn't tell me that, but I know where he was going" because "other people talk and just—I just [knew] it."

Additionally, Sloan testified on direct that he received about $1,500 from the Government "to get out of town for a few days." The Government asked whether there had "been concerns for your safety;" defense counsel objected, and the court responded that the Government could "ask if he had concerns." When the Government asked Sloan again whether he had "any concerns for [his] safety," Sloan answered yes, adding that Charles and Vassor were "supposed to belong to some kind of club out there in California," and Sloan "figured I know how they operate" and once "[t]hey found out I was telling on them, then they would call them, and they would come hunting for me. So I just wanted to be out of town for a while." Vassor moved for a mistrial based on Federal Rule of Evidence 404(b) because Sloan "testified that [Vassor] was a member of some club out in Los Angeles, which obviously creates an inference with this jury that . . . there's gang affiliation." Charles joined in the motion, which the court denied, ruling that there was "absolutely no basis for a mistrial based on this line of questions."

Cloyd testified that he had pleaded guilty to conspiring to distribute methamphetamine. When asked whether he was "in a conspiracy and agreement with others who were selling," however, Cloyd responded, "[n]ot so much agreement," though Charles "agreed to sell" methamphetamine to

6

him. The Government also questioned Cloyd about Vassor's involvement. When asked whether he knew Vassor, Cloyd stated that he "[j]ust met him."

At the close of evidence, Charles's counsel moved for dismissal of the charges against him under Federal Rule of Criminal Procedure 29(a), arguing that the Government had presented insufficient evidence of a conspiracy. Vassor also moved for a directed verdict of acquittal as to counts 1 and 5 of the superseding indictment. Neither defendant argued that a variance from the indictment occurred. The Government responded by listing the evidence it proffered in support of each count, and the court denied both motions, finding sufficient evidence to present each count to the jury.

The court convened a jury instructions conference with counsel. After reviewing and altering the instructions, the court asked counsel if they had "[a]ny other changes." The Government responded that it had "[n]o additional changes"; defense counsel did not respond with any changes. The next day, after closing arguments and out of the presence of the jury, the court asked whether counsel had any objections to the proposed jury instructions. None were raised. The jury found Charles and Vassor guilty on all counts on January 20, 2022. See Docs. 82, 164-2.

### 3. Sentencing Proceeding

On May 6, 2022, a Sentencing Hearing was held before Judge Danny C. Reeves. See Doc. 98. The Court sentenced Charles to 320 months on each Counts 1s, 2s, and 3s; 240 months on Count 4s; 120 months on Count 7s, all to run concurrently; and 60 months on Count 6s, to run consecutively to Counts 1s, 2s, 3s, 4s, and 7s; for a total term of 380 months' imprisonment. See Doc. 104. It is followed by 5 years of Supervised Release. See Doc. 124. This Court also ordered payment of a Mandatory Special Assessment Fee of $600. *Id.* Charles timely filed a Notice of Appeal. See Doc. 105.

7

### 4. Appellate Proceeding

On appeal, Charles and Vassor appealed their convictions and sentences for various drug and firearm offenses stemming from their alleged participation in a conspiracy to sell methamphetamine. Both challenge the sufficiency of the evidence to sustain their convictions for conspiracy. Charles also challenges the sufficiency of proof that he possessed a firearm in furtherance of a drug trafficking conspiracy. The Defendants further challenge the propriety of a witness's remark insinuating that they belonged to a gang in Los Angeles, urging that this statement warrants a mistrial, and contend that the district court's modification of the pattern jury instruction for venue in a conspiracy case amounted to reversible error. Finally, Vassor argued that his sentence was procedurally unreasonable because the district court inappropriately deferred to the Sentencing Guidelines and accompanying Commentary, and improperly calculated the drug quantity.

On August 31, 2023, the Sixth Circuit determined that the record contained substantial and legally sufficient evidence to sustain the convictions of Charles and Vassor on appeal. In affirming the judgment, the court concluded that, when viewed in the light most favorable to the government, the proof presented at trial was adequate for a reasonable jury to find both defendants guilty beyond a reasonable doubt. See *United States v. Charles*, Nos. 22-5424/5427.

On March 21, 2025, Charles filed a Petition for Writ of Certiorari, which was denied by the United States Supreme Court on April 23, 2025. See Docs. 172,174.

### IV. COGNIZABLE ISSUES UNDER 28 U.S.C. § 2255

The function of a § 2255 Motion to Vacate, Set Aside or Correct Sentence is to inquire into the legality of the federal prisoner's detention. See *Heflin v. United States*, 358 U. S. 415, 421 (1959). Section 2255 provides four grounds that justify relief for a federal prisoner who challenges

the imposition or length of his or her detention: (1) "that the sentence was imposed in violation of the Constitution or laws of the United States"; (2) "that the court was without jurisdiction to impose such sentence"; (3) "that the sentence was in excess of the maximum authorized by law"; or (4) "that the sentence is otherwise 'subject to collateral attack.'" 28 U. S. C. § 2255 (1994). Despite this apparently broad language, violations of federal law are only cognizable if they involve a "fundamental defect" resulting in a "complete miscarriage of Justice." *Davis v. United States*, 417 U. S. 333, 346 (1974).

Section 2255 permits a federal prisoner to bring a collateral challenge by moving the sentencing court to vacate, set aside, or correct the sentence. 28 U.S.C. § 2255(a). Once a petitioner files a § 2255 motion, "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall . . . grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto." 28 U.S.C. § 2255(b). A petitioner is entitled to an evidentiary hearing if he "alleges facts that, if true, would entitle him to relief." *Deltoro-Aguilera v. United States*, 625 F.3d 434 (8ᵗʰ Cir. 2010). "[A] petitioner need only allege – not prove – reasonably specific, non-conclusory facts that, if true, would entitle him to relief."*Owens v. Balt. City State's Attorneys Office*, 767 F.3d 379 (4ᵗʰ Cir. 2014). However, a district court need not hold a hearing if the allegations are "patently frivolous," "based upon unsupported generalizations," or "affirmatively contradicted by the record." *Holmes*, 876 F.2d at 1553.

A § 2255 Motion requires the district court to either order the government to respond or to hold an evidentiary hearing unless the Motion, files and record of the case demonstrate that no relief is warranted. See *Franco v. United States*, 762 F.3d 761 (8ᵗʰ Cir. 2014). "Under 28 U.S.C. § 2255,

9

unless the motion and record as constituted show conclusively that relief is not available, an evidentiary hearing should be held." 28 U.S.C. § 2255(b).

Upon granting a § 2255 Motion, "[t]he court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him . . . or correct the sentence as may appear appropriate." 28 U. S. C. § 2255. The remedy provided in § 2255 is broad and flexible, and entrusts the federal courts with the power to fashion appropriate relief. See *Andrews v. United States*, 373 U. S. 334, 339 (1963).

Ineffective assistance of counsel claims are cognizable in a § 2255 setting because they are of constitutional dimension. See *Kimmelman v. Morrison*, 477 U.S. 365, 371-79 and n.3 (1986); *Strickland v. Washington*, 466 U. S. 668 (1984).

To prevail on a claim of ineffective assistance of counsel, defendant must show that (1) his counsel's representation fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. See *Kimmelman*, 477 U. S. at 375.

The "reasonableness of counsel's challenged conduct" must be judged "on the facts of the particular case, viewed as of the time of counsel's conduct." *Lockhart v. Fretwell*, 506 U.S. 364, 371(1993)(citing *Strickland*, 466 U. S. at 690). In the course of the latter portion of this inquiry, the Court must consider not merely whether the outcome of the defendant's case would have been different, but also whether counsel's deficient performance caused the outcome to be unreliable or the proceeding to be fundamentally unfair. See *Lockhart*, 506 U. S. at 368-73. "Unreliability or unfairness does not result if the ineffectiveness of counsel does not deprive the defendant of any substantive or procedural right to which the law entitles him." *Lockhart*, 506 U. S. at 372. Thus,

10

prejudice is measured by current law and not by the law as it existed at the time of the alleged error.

*Id.*

The familiar two-part test of *Strickland* has been applied by the Supreme Court and the Second Circuit in a wide variety of contextual challenges to the effectiveness of counsel's performance. With regard to the performance prong of the *Strickland/Hill* test, "if a defendant is represented by counsel and pleas guilty upon advice of counsel, the voluntariness of the plea depends on whether counsel's advice was within the range of competence demanded of attorneys in criminal cases." *McMann v. Richardson*, 397 U. S. 759 (1970). "[T]o prove prejudice, [defendant] must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 841-42. "And, of course, 'any amount of actual jail time has Sixth Amendment significance,' which constitutes prejudice for purposes of the *Strickland* test." *Glover v. United States*, 531 U.S. 198, 203 (2001). Additionally, "[o]ne of the most precious applications of the Sixth Amendment may well be in affording counsel to advise a defendant concerning whether he should enter a plea of guilty." *Padilla v. Kentucky*, 130 S.Ct. 1473 (2010). "Before deciding whether to plead guilty, a defendant is entitled to 'the effective assistance of competent counsel.'" See *Missouri v. Frye*, 132 S.Ct. 1399 (2012); *Lafler v. Cooper*, 132 S.Ct. 1376 (2012); *Premo v. Moore*, 131 S.Ct. 733, 743 (2011); *Padilla v. Kentucky*, 130 S.Ct. 1473, 1480-81 (2010).

In an effort to provide guidance as to how *Hill* applies to differing factual settings, the Supreme Court decided *Lafler* and *Frye* and established a constitutional standard applicable in all of the separate phases of a criminal trial to which the Sixth Amendment applies, including the point at which a defendant decides whether to plead guilty to a crime. In *Lafler*, the Court held that when

11

counsel's ineffective advice led to an offer's rejection, and when the prejudice alleged is having to stand trial, a defendant must show that, but for the ineffective advice, there is a reasonable probability that the plea offer would have been presented to the court, that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the actual judgment and sentence imposed. In *Frye*, the Court held that the Sixth Amendment right to effective assistance of counsel extends to the consideration of plea offers that lapse or are rejected, and that right applies to "all 'critical' stages of the criminal proceedings."

Finally, in a ruling on a motion under § 2255, the District Court is required to hold a hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255.

## V. <u>DISCUSSION</u>

As a preliminary matter, Charles respectfully requests that this Court be mindful that *pro se* pleadings are to be construed liberally. See *Jamieson v. United States*, 692 F.3d 435 (6th Cir. 2012) (quoting *Martin v. Overton*, 391 F.3d 710, 712 (6th Cir.2004)) (*Pro se* pleadings are to be held to less stringent standards than formal pleadings drafted by lawyers, and should therefore be liberally construed); *Estelle v. Gamble*, 429 U.S. 97, 106 (1976) (same); and *Haines v. Kerner*, 404 U.S. 519, 520 (1972) (same).

### A.    <u>The Government Committed Prosecutorial Misconduct.</u>

The Government violated Charles' due process rights by knowingly presenting, relying upon, and failing to correct false and misleading testimony and impressions concerning the circumstances of Charles' arrest and the purported legality of Officer Weaver's conduct. Under *Napue v. Illinois*,

12

360 U.S. 264 (1959), and *Giglio v. United States*, 405 U.S. 150 (1972), the prosecution may not knowingly use false testimony or allow false impressions to go uncorrected when they relate to material issues in the case. The Sixth Circuit has repeatedly held that a *Napue* violation occurs not only when testimony is literally false, but also when it creates a materially misleading impression that the Government knows or should know is untrue. See, e.g., *Rosencrantz v. Lafler* (6th Cir. 2009); *Byrd v. Collins*, 209 F.3d 486 (6th Cir. 2000).

In this case, the government committed the following prosecutorial misconducts:

a. <u>False Statements Against Charles</u>. During closing argument, the prosecutor played only a truncated portion of Exhibit 46—a recorded conversation between Vassor and the confidential informant, Sloan, concerning "bad heroin." Rather than presenting the conversation in full, the prosecutor began playback near the end, at the point where Vassor stated that the person from whom he obtained the heroin had been "selling heroin his entire life." The prosecutor then stopped the video, pointed directly at Charles, and emphatically told the jury: "You see, Charles has been selling heroin his entire life."

That assertion was false and materially misleading. The complete, unedited February 8, 2021 recording shows that at the beginning of the same conversation, Vassor identified a different individual—"Black Jon" or "Black Von"—as the source of the heroin. At no point did Vassor name Charles (also known as Casper) as the supplier. By omitting the exculpatory portion of the exchange and presenting only the closing remark, the prosecutor created the false impression that the statement referred to Charles, when the full recording demonstrates otherwise.

The Government had represented to the trial court that the video was redacted to exclude prejudicial material. Yet the redaction was not neutral; it removed critical context that clarified the identity of the supplier. In doing so, the prosecution eliminated evidence that contradicted its theory and then affirmatively attributed the "lifetime" heroin-selling remark to Charles. This was not a fair inference drawn from the evidence—it was a distortion of the evidence itself.

The tactic was highly prejudicial. It portrayed Charles as a lifelong drug trafficker and encouraged the jury to convict based on character assassination

rather than on proof tied to the charged conduct. By selectively editing the recording and then explicitly identifying Charles as the subject of the statement, the Government invited the jury to rely on a false factual premise in determining guilt.

Such conduct implicates the due process principles articulated in *Napue v. Illinois* and consistently applied by the Sixth Circuit: the prosecution may not knowingly present, or fail to correct, testimony that is false or that creates a materially misleading impression. The same edited version of Exhibit 46 was later transmitted to the Sixth Circuit in *United States v. Charles*, thereby perpetuating the misleading presentation of the evidence on appeal. When the Government presents evidence in a manner that distorts its meaning and obscures exculpatory context, it raises serious due process concerns under *Napue* and its Sixth Circuit progeny.

b.　　False Evidence. It is firmly established that a prosecutor's knowing presentation of false evidence violates a defendant's right to due process. A conviction obtained through the knowing use of perjured testimony is fundamentally unfair and must be vacated if there is any reasonable likelihood that the false testimony could have affected the jury's verdict. The constitutional violation occurs regardless of whether the prosecutor actively solicited the false testimony or simply allowed it to stand uncorrected once it became apparent.

For example, (1) with respect to the **withheld GPS data,** the prosecutor questioned Detective Parke about the use of a GPS tracker placed on Charles' vehicle. Parke testified that law enforcement used the tracker to monitor Charles' locations and movements, indicating that officers relied primarily on electronic monitoring rather than consistent physical surveillance. However, the underlying GPS data was not disclosed to the defense. The failure to produce that information deprived the defense of potentially exculpatory or impeaching evidence, implicating the Government's disclosure obligations under *Brady*. Moreover, the warrantless or inadequately disclosed tracking of Charles' vehicle raises serious Fourth Amendment privacy concerns, particularly in light of constitutional limitations on prolonged GPS monitoring.

(2) **Withheld Phones and Phone Records.** The Government also failed to disclose the phones and corresponding phone records that would have demonstrated that Charles and Vassor never communicated with one another on June 8, 2021. Throughout trial, the prosecutor repeatedly told the jury, "You see, Vassor called Charles," and "You see, Vassor said Charles will take care of Sloan." Those assertions were not supported by the actual evidence. In the recorded exchanges, Vassor did not mention Charles or

14

"Casper" by name. Instead, he referred only to "his boy." At one point, Vassor told Sloan that "my boy" was in Frankfort, Kentucky, with his son and would call back at 4:00 p.m. Charles, however, was in Lexington, Kentucky, at home that day. Nothing in the recording identifies Charles as the individual being referenced. The prosecutor's argument therefore invited the jury to substitute Charles' name for an unidentified third party. The withheld phone records would have objectively confirmed that no calls occurred between Charles and Vassor on June 8, 2021, thereby directly undermining the Government's repeated assertions in closing argument. The suppression of that evidence deprived the defense of critical impeachment material and exculpatory proof, constituting yet another violation of the Government's disclosure obligations under *Brady v. Maryland*.

(3) **Subpoena to Verizon Wireless.** On June 10, 2021, the United States Department of Justice/Drug Enforcement Administration issued a subpoena to Verizon Wireless for phone number (859) 940-5608, signed by Ricky W. Hardin, GS, and executed by Detective Parke. At trial, the Government represented that there were no records for Charles' phones. However, Parke had in fact obtained a subpoena for one of Charles' phones, yet this fact was never disclosed to the defense. See Exhibit 4.

Moreover, there were at least three additional phones associated with Charles that the Government did not address or produce. The withheld records could have definitively shown that Charles and Vassor never communicated with one another on June 8, 2021. By suppressing this evidence, the Government deprived the defense of proof that directly contradicts its theory of the case. This suppression constitutes a clear violation of the Government's obligations under *Brady v. Maryland*, as the evidence was both favorable and material. Had the records been disclosed, they could have established that Charles and Vassor did not engage in the alleged conspiracy charged in Count 1, thereby supporting Charles' innocence.

(4) **Withholding Information on Kentucky State Police Trooper Jack Gabriel ("Gabriel").** KSP Trooper Gabriel was the officer who initiated the traffic stop of Charles. In his written report, Gabriel stated that the basis for the stop was that Charles was swerving within his lane and executed a lane change with a delayed signal. However, at trial, Parke testified that he instructed KSP troopers to stop Charles before he reached the alleged meeting location. That testimony directly calls into question whether the stop was truly based on independent traffic violations or was pretextual and prearranged.

15

During trial, the prosecutor displayed video footage of the traffic stop. Notably, the video began only after Gabriel activated his emergency lights and did not depict Charles' driving behavior prior to the stop. Thus, the footage did not corroborate Gabriel's stated justification for initiating the stop.

Internal police records documenting officer misconduct—particularly those involving dishonesty—constitute classic impeachment material. Such records are frequently maintained within law enforcement agencies and are not publicly accessible, yet they fall squarely within the prosecution's disclosure obligations when they bear on a testifying officer's credibility. When officers with documented histories of dishonesty are permitted to testify without disclosure of that information, the defense is deprived of a meaningful opportunity to challenge credibility before the jury.

If Gabriel's background included questionable or disturbing conduct bearing on truthfulness, the prosecution either knew or should have known of that information. The failure to disclose such impeachment evidence to defense counsel—thereby preventing investigation and a potential request for Gabriel's personnel file—constitutes a violation of the Government's obligations under *Brady v. Maryland* and its progeny. Suppression of material impeachment evidence concerning a key law enforcement witness undermines confidence in the verdict and implicates fundamental due process protections.

Taken together, the Government's actions in this case reflect more than isolated evidentiary disputes—they demonstrate a pattern of prosecutorial misconduct that undermined the fundamental fairness of the proceedings. The Constitution guarantees not merely a trial, but a fair trial. That guarantee is compromised when the prosecution selectively edits evidence, advances factual assertions unsupported by the record, and withholds material exculpatory and impeachment evidence from the defense.

Here, the Government truncated Exhibit 46 to create a misleading impression that Charles had been "selling heroin his entire life," despite the full recording identifying a different individual. It repeatedly told the jury that Vassor called or referred to Charles, even though no names were

16

mentioned and objective phone records—had they been disclosed—would have shown that Charles and Vassor did not communicate on the critical date. The Government failed to disclose subpoenaed Verizon records and additional phone data that could have disproven the alleged conspiracy. It also presented testimony regarding the traffic stop without disclosing potentially impeaching information concerning the initiating officer, thereby insulating a key witness from meaningful credibility challenges.

Under *Napue v. Illinois*, the prosecution may not knowingly present or fail to correct false or materially misleading testimony. Under *Brady v. Maryland*, the Government must disclose evidence favorable to the accused that is material to guilt or punishment, including impeachment evidence. These obligations are not aspirational; they are constitutional mandates designed to protect the integrity of the truth-seeking process.

The cumulative effect of the Government's conduct cannot be ignored. When the State distorts recordings, attributes statements not supported by the evidence, withholds objective records that contradict its theory, and suppresses impeachment material regarding key witnesses, confidence in the verdict is fundamentally undermined. The question is not whether the jury might still have convicted absent these improprieties; rather, it is whether there exists a reasonable likelihood that the false or suppressed evidence affected the judgment. In this case, that likelihood is undeniable.

A conviction obtained through misleading presentation and suppression of material evidence does not comport with due process. Where prosecutorial misconduct infects the trial in this manner, the resulting judgment cannot stand.

**B.**      **Pretrial Counsel's Failure To: (1) Communicate with Charles and Inform Him of the Relevant Circumstances and Likely Consequences of Pleading Guilty As Opposed to Proceeding to Trial; (2) Conduct An Adequate and Independent Pretrial Investigation; and (3) Attempt to Negotiate A Favorable Plea Agreement Deprived Charles of Effective Assistance of Pretrial Counsel Under the Sixth Amendment of the Constitution of the United States.**

1.    Communicate with Charles and Inform Him of the Relevant Circumstances and Likely Consequences of Pleading Guilty as Opposed to Proceeding to Trial

Reasonable communication between an attorney and client is a cornerstone of effective representation and essential to the client's ability to meaningfully participate in his own defense. *Strickland v. Washington*, 466 U.S. 668, 688 (1984), recognizes that counsel must bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process. The Sixth Circuit has similarly acknowledged that a lack of communication between attorney and client can support an ineffective assistance of counsel claim, especially where it results in the client being uninformed about the case or coerced into a plea. *Smith v. United States* (6th Cir. 2003); *Griffin v. United States* (6th Cir. 2003).

In this case, Charles was initially represented by Thomas Lyons ("Lyons"), but due to a persistent breakdown in communication, the Court replaced him with Andrew Sparks ("Sparks") on December 22, 2021– only 27 days before trial. Lyons met with Charles three times in person and conducted several video calls, each lasting approximately 45 minutes to an hour. During these sessions, Lyons discussed basic case matters such as the possibility of a plea deal, drug quantities, firearms allegations, and the overarching conspiracy charges.

However, Lyons failed to provide meaningful strategic guidance. He would not take action on requests or suggestions from Charles that might have been beneficial to his defense, often

18

dismissing them by saying such strategies "are not how it works in federal court" or noting they might be possible in California state court. He frequently emphasized his other commitments, including preparing for a double-homicide trial, giving Charles the impression that his case was a lower priority. This pattern of dismissal and lack of engagement created a communication gap that prevented Charles from participating meaningfully in the preparation of his defense.

The only substantive encouragement Charles received from Lyons was that he "has a very good chance of beating Count 1s, the conspiracy." Beyond this, Lyons' interactions were largely negative, unresponsive, and failed to provide the competent pretrial advocacy required under the Sixth Amendment. A defendant has the right to effective assistance of counsel, including competent advice and active preparation to pursue legitimate defenses. *Strickland v. Washington*, 466 U.S. 668, 688–89 (1984). Lyons' limited and dismissive engagement undermined Charles' ability to prepare for trial, leaving critical issues uninvestigated and contributing to the need for replacement just weeks before trial.

Accordingly, Charles's conviction and sentence should be vacated, and he should be afforded the opportunity to proceed to trial with effective representation.

2.    Failure to File Any Substantive Pretrial Motions and An Adequate and Independent Pretrial Investigation

Here, Charles is unaware of any meaningful pretrial investigation conducted by Lyons. Lyons did not identify or present any defense witnesses. Instead, he advised Charles to keep Latasha Freeman ("Freeman"), his girlfriend and the mother of his child, away from his case because the prosecutor allegedly threatened to charge her as well. This advice effectively discouraged the development of potentially favorable testimony.

19

Charles repeatedly requested that Lyons investigate the timing and legality of the search of his home on June 8, 2021. Specifically:

- Charles informed Lyons that police officers entered and searched his residence before a search warrant affidavit was written and before a judge signed the warrant at 8:54 p.m.

- Charles directed Lyons to obtain security camera footage from a next-door neighbor, which he believed would show officers entering the residence before the warrant was signed.
- Charles asked Lyons to investigate the circumstances under which Freeman was initially told no one could enter or exit the residence, but was later permitted to enter and retrieve the family dog — potentially after officers had already searched the home.

Lyons refused to pursue these leads, dismissing them as "speculation" and stating there was no proof. However, strategic decisions are reasonable only if based on adequate investigation. See *Strickland v. Washington*, 466 U.S. 668, 690–91 (counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary). See also *Wiggins v. Smith*, 539 U.S. 510, 521–23 (strategic choices made after incomplete investigation are reasonable only to the extent that reasonable professional judgments support the limitations on investigation).

Additionally, Charles reviewed the Discovery provided on a flash drive while housed in Grayson County, Kentucky. He observed video footage timestamped at 8:55 p.m. showing officers conducting a walkthrough of his home. In the video, closets were open, lights were on, clothing and personal items were disturbed, and the residence appeared to have already been searched. Charles reported this to Lyons, who again refused to pursue suppression, stating there was no proof and declining to file a Motion to Suppress.

20

If officers entered and searched the residence before the warrant was signed, suppression would have been constitutionally required absent exigent circumstances. See *Mapp v. Ohio* and *Kentucky v. King* (warrantless searches inside a home are presumptively unreasonable unless justified by exigency). Lyons refused to file a motion to suppress despite being directed to investigate these facts.

Lyons also failed to obtain Charles' phones and phone records, which Charles insisted would demonstrate that he did not communicate with co-defendant Vassor on June 8, 2021. Lyons stated the government possessed the phones and would introduce them at trial. However, the prosecution did not introduce the phones or any phone records at trial. Lyons never independently sought those records, subpoenaed them, or investigated the issue.

After declining to pursue these investigative avenues, Lyons told Charles he "does not have a defense." At that point, communication completely deteriorated, and Charles lost all trust and confidence in counsel. On December 22, 2021, the Court appointed Sparks and directed Lyons to transfer the full case file.

Sparks had only twenty-seven (27) days before trial in a complex federal prosecution involving: (1) Sloan, a confidential informant, (2) GPS tracking devices, (3) Pole cameras, (4) Audio and video recordings, (5) Alleged phone communications, and (6) Extensive investigative reports.

Despite the complexity, Sparks largely relied on Lyons' prior preparation. Sparks did not independently investigate the timing of the search, did not obtain the neighbor's security footage, and did not pursue suppression. When Charles again raised the issue of his phone records disproving contact with Vassor, Sparks repeated Lyons' position that the prosecutor possessed the phones and would present them at trial — which never occurred.

21

Sparks likewise dismissed concerns about officers entering the home before the warrant was signed, stating there was no proof, and took no action to investigate further.

Defense counsel has a constitutional duty to conduct a "reasonably substantial, independent investigation" into both the facts of the case and applicable law to provide effective assistance. See *Bigelow v. Williams*, 367 F.3d 562 (6th Cir. 2004). This duty is well established by the Supreme Court in *Strickland v. Washington*, which states:

> Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland v. Washington*, 466 U.S. 668, 690-91 (1984).

In this case, Sparks wholly failed to conduct a constitutionally adequate pretrial investigation. Specifically:

a.    Failing to Investigate Legality of the GPS Tracker

The record reflects that the warrant authorizing installation of the GPS tracker was signed on February 10, 2021, but was not executed until February 22, 2021—twelve days later. See Exhibit 1. Under Federal Rule of Criminal Procedure 41(e)(2)(A), a warrant must generally be executed within fourteen days, and installation of a tracking device must occur within the time specified by the warrant and Rule 41. If the warrant itself required execution within a shorter period, execution beyond that time would render the installation unlawful absent a valid judicial extension. No such extension appears in the discovery materials.

Even more concerning are statements indicating that law enforcement was monitoring Charles' white Volvo in "early February 2021," including as early as February 1, 2021—before the warrant was signed on February 10 and well before the February 22 execution date. *Id.* If monitoring occurred before judicial authorization

22

and installation of the device, then either (1) the GPS tracker was installed and used without a valid warrant in violation of the Fourth Amendment, or (2) the representations regarding the monitoring timeline were materially inaccurate. Under *United States v. Jones*, the attachment of a GPS device to a vehicle and the use of that device to monitor movements constitutes a search requiring a valid warrant. The United States Court of Appeals for the Sixth Circuit has repeatedly enforced *Jones* and suppressed evidence derived from unlawful tracking where warrant requirements were not satisfied, including in *United States v. Fishe*.

Additional inconsistencies regarding monitoring and the absence of produced GPS data should have prompted competent pretrial counsel to subpoena the raw GPS data, installation logs, return of warrant, and chain-of-custody documentation. A reasonable pretrial investigation would have examined whether officers relied on tracking information to establish probable cause for subsequent enforcement actions. Counsel's failure to pursue these materials left unexamined whether the government's probable cause rested on potentially unlawful surveillance.

Under *Kimmelman v. Morrison*, failure to litigate a meritorious Fourth Amendment claim may constitute ineffective assistance under *Strickland*. Similarly, the Sixth Circuit has recognized prejudice where counsel failed to pursue suppression of unlawfully obtained evidence, see *Ray v. United States*. Moreover, where illegally obtained evidence forms the basis for probable cause supporting additional warrants, suppression extends to derivative evidence under the doctrine articulated in *Wong Sun v. United States*.

Had Sparks conducted a reasonable investigation into the warrant execution discrepancy and the apparent pre-warrant monitoring, counsel would have moved to suppress:

- All GPS-derived location evidence;
- Any traffic stop predicated on GPS-based monitoring;
- The subsequent vehicle search; and
- Any residential search warrant to the extent probable cause relied on GPS-derived information.

Without GPS-derived surveillance, law enforcement may have lacked the probable cause necessary to justify the stop and subsequent searches. Suppression therefore carried a reasonable probability of significantly altering the evidentiary foundation of the prosecution.

The Sixth Circuit has emphasized that counsel has a duty to conduct reasonable investigations or to make a reasonable decision that renders particular investigations unnecessary. See *Bigelow v. Haviland*. Failure to review warrant timelines, obtain

23

tracking records, or analyze discrepancies in monitoring dates cannot be characterized as reasonable strategic judgment; rather, it reflects a failure to fulfill the constitutional duty to investigate.

In sum, Sparks' failure to investigate and litigate the GPS tracking irregularities fell below objective professional standards and prejudiced Charles. Under *Strickland* and governing Sixth Circuit authority, this omission constitutes ineffective assistance of counsel warranting relief.

b.    Failure to Challenge the Unlawful Monitoring of Charles' Vehicle

This failure infected every subsequent investigative step. Once the vehicle stop was initiated—based on real-time tracking—the search of the car followed, and information derived from that search was then used to establish probable cause for the warrant to search Charles' residence. If the GPS monitoring was unlawful or executed outside the scope and timing authorized by the warrant, then the vehicle stop and all derivative searches were constitutionally tainted.

Under *Wong Sun*, evidence obtained directly or indirectly from unconstitutional conduct must be suppressed as "fruit of the poisonous tree" unless the government can establish attenuation, independent source, or inevitable discovery. No such showing was made here. Instead, the investigative chain flowed directly from the disputed GPS tracking to the stop, to the vehicle search, and ultimately to the residential warrant.

The Fourth Amendment protects individuals from unreasonable searches and seizures, and the Supreme Court has made clear that electronic location monitoring through GPS constitutes a search requiring strict adherence to warrant requirements. See *United States v. Jones*. Where officers exceed the scope or timing of judicial authorization, the search is unreasonable. The Sixth Circuit has reinforced that suppression is warranted where officers fail to comply with warrant limitations governing tracking devices. See *United States v. Fisher*.

Here, if the GPS device was either installed late, used before installation, or relied upon beyond the warrant's temporal limits, then the vehicle stop lacked lawful predicate. Without lawful GPS-based monitoring, officers would not have been positioned to coordinate the June 8, 2021 stop in real time. The subsequent search of the vehicle would therefore have been subject to suppression under the Fourth Amendment.

Critically, the residential search warrant would also collapse. Probable cause cannot rest on illegally obtained information. When tainted information is excised from an affidavit, and the remaining content fails to establish probable cause, suppression is

required. See *Franks v. Delaware*; see also *United States v. Laughton* (holding that courts must confine review to the four corners of the affidavit and determine whether sufficient untainted facts establish probable cause).

Had Sparks investigated the warrant dates, subpoenaed GPS data logs, challenged the inconsistent testimony, and moved to suppress both the vehicle and residential searches, there is a reasonable probability the evidence would have been excluded. And without that evidence, the prosecution's theory would have been fundamentally weakened—if not entirely dismantled.

Under *Strickland v. Washington*, prejudice is established where confidence in the outcome is undermined. Here, suppression of the vehicle and residence searches would have altered the evidentiary landscape so dramatically that there is at least a reasonable probability of a different verdict. Sparks' failure to litigate these Fourth Amendment violations therefore deprived Charles not only of effective assistance under the Sixth Amendment, but also of the substantive protections guaranteed by the Fourth Amendment's right to privacy and freedom from unreasonable searches.

c.    Failure to Subpoena and Litigate the Pole Camera Surveillance

Law enforcement installed a pole camera directed at Cloyd's residence on or about January 29, 2021. See Exhibit 2. Around that same period, officers claimed they were "monitoring" Charles' vehicle in early February—despite the GPS warrant not being executed until February 22, 2021. See Exhibit 1. Officers asserted that GPS monitoring showed Charles traveling toward Cloyd's residence, prompting on-scene observation of Charles and Vassor arriving there. Yet **no pole-camera footage was produced in Discovery**.

Officer Parke stated that video footage was unnecessary because officers personally observed the activity. At the same time, he acknowledged **there was no GPS data demonstrating that Charles and Cloyd were ever in contact**. This inconsistency is critical. If GPS data did not place Charles at the residence, then the government's narrative relied heavily on unproduced pole-camera surveillance and officer recollection. Conversely, if GPS monitoring was used to direct officers to the residence, then the legality and accuracy of that tracking was central to any suppression analysis.

Under *Strickland v. Washington*, counsel has a duty to conduct a reasonable investigation or to make a reasonable decision that renders further investigation unnecessary. The United States Court of Appeals for the Sixth Circuit has emphasized that failure to obtain readily available evidence central to the prosecution's theory may constitute deficient performance. See *Bigelow v. Haviland*.

25

Competent counsel would have subpoenaed: (1) The complete pole-camera footage from January through June 2021; (2) Installation logs and maintenance records; (3) Metadata reflecting recording times and preservation history; and (4) Any reports referencing pole-camera observations.

If the footage did not show Charles at the residence, it would have directly impeached the officers' account. If the footage did show Charles, it would have clarified whether officers relied on unlawful or pre-warrant tracking to coordinate surveillance. Either scenario constituted potentially exculpatory or impeachment material that required investigation.

The government's failure to produce the footage also raises concerns under *Brady v. Maryland* and its progeny. Suppression of material evidence favorable to the accused violates due process where the evidence is material to guilt or punishment. The Sixth Circuit has repeatedly held that impeachment evidence falls within *Brady*'s scope. See *United States v. Tavera*. If the pole-camera footage contradicted or failed to corroborate the officers' assertions, it was material impeachment evidence subject to disclosure and litigation.

Moreover, the Supreme Court has recognized that electronic surveillance implicates significant Fourth Amendment privacy concerns, particularly when used to monitor movements associated with a private residence. See *Carpenter v. United States*. While pole cameras raise distinct doctrinal questions, the broader principle underscores the importance of scrutinizing location-based surveillance used to establish probable cause.

Counsel's failure to subpoena and litigate the pole-camera footage deprived Charles of the opportunity to impeach contradictory representations regarding GPS monitoring; challenge whether officers relied on unlawful pre-warrant tracking; argue spoliation or evidentiary suppression; and undermine probable cause supporting subsequent searches.

Prejudice under *Strickland* is evident. The government's theory linking Charles to Cloyd's residence rested on a combination of alleged GPS monitoring and officer observation. Without corroborating pole-camera evidence—and with GPS data either nonexistent or legally questionable—the reliability of that linkage would have been substantially weakened at the suppression stage and in pretrial litigation.

By failing to subpoena the pole-camera footage and meaningfully litigate its absence, Sparks did not subject the government's surveillance narrative to constitutionally adequate adversarial testing. This omission constituted deficient performance and undermines confidence in the outcome, in violation of Charles' Sixth Amendment right to effective assistance of counsel.

d.    Failure to Obtain and Forensically Examine Phone Records

The prosecution's theory of Count 1s rested heavily on the assertion that Charles and Vassor communicated on June 8, 2021. On the February 8, 2021, 1:19p.m.'s recorded phone call of Sloan to Vassor ,Vassor's number was noted as (661) 2126524. As per the Cell Phone Call Detail Records (CDRs), there is **no evidence in these logs** that 8599405608 called or received a call from (661) 2126524. See Exhibit 3. Charles consistently requested that appointed counsel obtain his phone records to establish that no such communication occurred. He first made this request to Lyons and, after substitution of counsel, renewed it with Sparks. Despite these requests, counsel did not subpoena carrier records, secure a forensic extraction of the device, or retain a digital forensics expert to independently verify the existence—or absence—of any contact. Ultimately, the prosecution did not introduce certified phone records demonstrating that Charles and Vassor communicated on June 8, 2021.

Under *Strickland v. Washington*, counsel has a duty to conduct a reasonable investigation into facts central to the prosecution's theory of guilt. The United States Court of Appeals for the Sixth Circuit has repeatedly recognized that failure to obtain readily available records or consult appropriate experts may constitute deficient performance where such evidence is critical to guilt or innocence. See *Townsend v. Lafler* (recognizing duty to investigate potentially exculpatory evidence); see also *Richey v. Bradshaw* (finding ineffective assistance where counsel failed to consult experts necessary to challenge the prosecution's forensic theory).

Phone records and forensic extraction reports are objective, independently verifiable data. If, as Charles maintains, no call or communication occurred between him and Vassor on June 8, 2021, then a subpoena to the cellular carrier—together with a forensic download and expert analysis—could have conclusively established the absence of contact. *Id.* Conversely, if some communication existed, counsel would have been equipped to scrutinize the timing, duration, and context of that data rather than leaving the issue to inference.

The Supreme Court in *Kimmelman v. Morrison* recognized that failure to conduct pretrial discovery and investigate tangible evidence central to the government's case may amount to constitutionally deficient representation. That principle applies squarely here. Where the prosecution's theory depends on alleged coordination or agreement, objective telecommunications data is not peripheral—it is foundational.

Moreover, under *Brady v. Maryland*, suppression of material exculpatory evidence violates due process. If call detail records or forensic data would have shown no contact between Charles and Vassor on June 8, 2021, such evidence was plainly material. Competent counsel would have either compelled its production or independently obtained it.

27

Prejudice under *Strickland* is evident. Count 1s depended substantially on establishing coordination or communication. If certified carrier records and expert forensic analysis demonstrated that Charles and Vassor never communicated on June 8, 2021, the prosecution's timeline and theory of agreement would have been materially undermined. At minimum, there exists a reasonable probability that the factfinder would have harbored reasonable doubt.

The failure of Sparks to subpoena carrier data, obtain phone records, or retain a digital forensics expert deprived Charles of a critical defense grounded in objective technological evidence. This omission was not a strategic decision informed by investigation; it was a failure to investigate at all. Under *Strickland* and controlling Sixth Circuit authority, such failure constitutes ineffective assistance of counsel and undermines confidence in the outcome on Count 1s.

e.   Failure to Challenge the Warrantless "Protective Sweep" and Resulting Search

The record reflects that on June 8, 2021, law enforcement secured Charles' residence after he left the home. The subsequent warrant affidavit confirms that the premises remained under police control before the affidavit was even drafted. During that period—before any search warrant was issued—officers conducted what they characterized as a "protective sweep." No exigent circumstances were articulated. No emergency was unfolding, no suspect was believed to be inside posing a threat, and no facts suggested imminent destruction of evidence or danger to officers or the public.

Under *Maryland v. Buie*, a protective sweep is a narrowly confined exception to the Fourth Amendment's warrant requirement. It is permissible only when officers possess specific and articulable facts that would warrant a reasonably prudent officer in believing that the area harbors an individual posing a danger. It is not a general exploratory search and cannot be justified merely because officers intend to seek a warrant.

The United States Court of Appeals for the Sixth Circuit has repeatedly held that absent articulable danger, a warrantless sweep violates the Fourth Amendment. In *United States v. Colbert*, the court held a sweep unlawful where suspects were secured and no evidence suggested another person posed a threat. Here, Charles was not inside the residence, the premises were secured, and law enforcement maintained exclusive control. Under *Colbert*, once suspects are secured and no facts indicate a dangerous third party is present, a sweep is unconstitutional.

Officers did not relinquish control of the premises after the sweep. Items allegedly observed—including firearms in an upstairs bedroom closet and narcotics and firearms in a basement closet—remained under police dominion. When officers maintain control of a residence after an unlawful entry and observation, the taint is

28

not dissipated. Under *Wong Sun v. United States*, evidence derived from unconstitutional conduct must be suppressed unless an exception applies.

The affidavit for the subsequent search warrant allegedly omitted reference to the prior warrantless sweep. Under *Franks v. Delaware*, a warrant is invalid where material omissions or misrepresentations were made knowingly or recklessly and were necessary to the finding of probable cause. If officers omitted the fact of the prior unlawful sweep—and the observations made therein—to shield those observations from judicial scrutiny—that omission is constitutionally significant and would have warranted a *Franks* hearing.

Additionally, officers reportedly prevented entry to others, including Freeman, but later allowed her to enter to retrieve a family pet, then followed her inside and conducted the sweep. The Sixth Circuit has made clear that officers may not manufacture exigent circumstances to justify warrantless entry. See *United States v. Chambers*. Where officers had already secured the perimeter and controlled access, no urgent threat required immediate intrusion.

Under the exclusionary rule established in *Mapp v. Ohio*, evidence obtained during an unlawful sweep—and any derivative evidence—must be suppressed. If the firearms and narcotics were first observed during the unconstitutional entry, and that information informed the subsequent warrant application, suppression would have been required once the tainted material was excised.

Under *Strickland v. Washington*, counsel's failure to file a suppression motion constitutes deficient performance where such a motion would have had a reasonable probability of success. Competent pretrial counsel would have moved to suppress evidence obtained from the residence; sought a *Franks* hearing based on material omissions; challenged the absence of exigent circumstances under *Buie* and *Colbert*; and litigated fruit-of-the-poisonous-tree taint under *Wong Sun*.

The firearms and narcotics recovered from the residence formed the evidentiary core of the prosecution's case. Had those items been suppressed, there is a reasonable probability the outcome—particularly as to the firearm charge—would have been different.

The Fourth Amendment affords the highest degree of protection to the home. Warrantless entry into a secured residence, absent exigency or articulable danger, strikes at the heart of that protection. Pretrial counsel's failure to litigate this constitutional violation constitutes deficient performance and undermines confidence in the outcome under *Strickland*.

29

f.    Failure to Seek Independent Investigative Resources

Sparks failed to file a motion requesting funds for a private investigator, as permitted under 18 U.S.C. § 3006A(e). The Sixth Circuit has emphasized the necessity of utilizing such resources when needed to challenge the government's case. See *Richey v. Bradshaw*, 498 F.3d 344 (6th Cir. 2007) ("Counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."). Instead, Sparks limited his investigation to reviewing the government's case file and engaging in discussions with the prosecutor, without conducting any independent inquiries to corroborate or challenge the government's evidence.

g.    Prejudice to Charles

Sparks' failure to conduct a meaningful investigation prejudiced Charles by depriving him of a viable defense and leaving the government's case uncontested. As the Supreme Court has made clear, "counsel's failure to investigate a potential defense strategy constitutes deficient performance where that failure is not based on reasonable professional judgment." *Wiggins v. Smith*, 539 U.S. at 534.

h.    Had Sparks Conducted A Thorough Investigation

Had Sparks conducted a thorough and independent pretrial investigation, there is a reasonable probability that the evidentiary foundation of the government's case would have been significantly weakened. The Sixth Amendment requires more than passive acceptance of the prosecution's narrative; it demands active testing of the State's evidence through reasonable investigation. Under *Strickland v. Washington*, counsel must either conduct an adequate investigation or make a reasonable, informed decision that further investigation is unnecessary.

A thorough investigation would have included subpoenaing objective records, consulting appropriate forensic experts, scrutinizing warrant timelines, and litigating constitutional violations surrounding electronic surveillance and the residential entry. Each of these areas implicated core components of the prosecution's theory—location tracking, alleged communication, and physical evidence recovered from the home.

The United States Court of Appeals for the Sixth Circuit has repeatedly held that failure to investigate evidence central to the government's case may constitute deficient performance where the omission undermines confidence in the outcome. See, e.g., *Richey v. Bradshaw*. Here, meaningful investigation could have supported suppression motions, impeachment of key officers, or objective forensic rebuttal of alleged communications and tracking data.

Because the government's case depended on surveillance, coordination, and evidence seized from the residence, a constitutionally adequate investigation had the potential to dismantle essential elements of proof. The failure to undertake that investigation was not a strategic decision grounded in informed judgment—it was an abdication of counsel's duty. Under *Strickland*, that failure establishes both deficient performance and a reasonable probability of a different outcome.

In light of the above, Sparks' failure to conduct an adequate and independent pretrial investigation constituted ineffective assistance of counsel under *Strickland*. This deficiency deprived Charles of the ability to make informed decisions about his defense and undermined the fairness of the proceedings. Therefore, Charles' conviction and sentence should be vacated, and he should be granted relief to ensure his constitutional rights are preserved.

31

3.    Failure to Attempt to Negotiate a Favorable Plea Agreement

Effective assistance of counsel during plea negotiations is a cornerstone of the Sixth Amendment. The Supreme Court has emphasized that a defendant must be adequately informed of "the relevant circumstances and the likely consequences" of pleading guilty versus proceeding to trial in order to make an intelligent decision. See *Lee v. United States*, 582 U.S. ___ (2017); *Brady v. United States*, 397 U.S. 742, 748 (1970). Counsel's role includes providing accurate information about potential sentencing exposure, plea offers, and the strengths and weaknesses of the case.

It is well established that when a defendant pleads guilty as a result of inaccurate legal advice, misrepresentations, or deficient performance by counsel, the resulting plea may be involuntary and constitutionally infirm. Under *Strickland v. Washington*, 466 U.S. 668, 688–89 (1984), a defendant is denied effective assistance when counsel's performance falls below an objective standard of reasonableness, and that deficiency prejudices the outcome. In the plea context, *Hill v. Lockhart*, 474 U.S. 52, 59 (1985), applies *Strickland*'s two-part test and makes clear that a guilty plea entered due to misadvice regarding material facts—including sentencing exposure or evidentiary strength—can constitute both deficient performance and prejudice.

The Sixth Circuit has echoed this principle in multiple cases, holding that misleading plea advice, especially when it causes a defendant to forego a trial or plead under coercive misunderstanding, violates the Sixth Amendment. See *Magana v. Hofbauer*, 263 F.3d 542 (6th Cir. 2001) ("Defense counsel's failure to inform defendant of material terms of a plea offer or misrepresenting sentencing exposure can constitute ineffective assistance.") (plea vacated where counsel advised client to accept plea based on fear of life sentence and overstated evidence); *United States v. Morris* (6th Cir. 2006) (ineffective assistance found where plea was based on incorrect legal

32

assumptions and misadvice).

Lyons advised Charles to accept a plea deal offering fifteen (15) to seventeen (17) years on the conspiracy (count 1s), plus a mandatory consecutive five (5) years under 18 U.S.C. § 924(c), for a total sentencing exposure of twenty (20) to twenty-two (22) years. Charles consistently maintained that he was not part of any conspiracy and refused the plea. Rather than providing objective advice regarding trial strategy, defenses, or evidentiary weaknesses, Lyons repeatedly urged Charles to accept the plea so that the case would be concluded and he could focus on other matters, including a double-homicide trial he was preparing at the same time.

Under *Missouri v. Frye*, 566 U.S. 134 (2012), and *Lafler v. Cooper*, 566 U.S. 156 (2012), the Sixth Amendment guarantees effective assistance of counsel during plea negotiations. Counsel must provide competent advice and cannot pressure a defendant to accept a plea for reasons unrelated to the client's best interests. A defendant's decision whether to plead guilty or proceed to trial must be informed by adequate investigation and reasonable professional judgment. See *Strickland v. Washington*, 466 U.S. 668, 690–91 (1984).

In addition, Lyons failed to investigate potentially exculpatory evidence. Charles specifically asked Lyons to interview Freeman's father, who arrived at Charles' residence around 6:45–7:00 p.m. on June 8, 2021, and observed law enforcement already inside the home conducting a search. However, the search warrant was not signed by the judge until 8:54 p.m. that same evening. This witness could have provided material testimony regarding the timing and legality of the search.

Lyons refused to pursue this witness, advising Charles that the testimony would "not look good" because the witness had prior arrests and a criminal record, and that it would simply be "his word against the police." This reasoning reflects a failure to conduct reasonable investigation. The

Supreme Court has made clear that strategic decisions are reasonable only if they are based on adequate investigation. See *Wiggins v. Smith*, 539 U.S. 510, 521–23 (2003). Declining to interview a potentially critical witness based solely on assumptions about credibility, without investigation, falls below professional norms.

Charles relied on Lyons' advice because he had never been to trial before and trusted appointed counsel to act in his best interest. Instead, Lyons' performance was influenced by competing professional obligations and a desire to resolve the case quickly, rather than by a thorough evaluation of Charles' defenses.

This deficient advice and failure to investigate prejudiced Charles by undermining his ability to make an informed plea decision and by failing to pursue a potentially meritorious Fourth Amendment challenge to the search of his residence. Under *Strickland*, both deficient performance and resulting prejudice are present.    Lyons could have acted proactively, investigated the case thoroughly, challenged jurisdictional and procedural defects, and used these facts to negotiate a fair and favorable plea agreement. By doing none of these, Charles was left exposed to full federal prosecution under invalid circumstances.

C.    **Trial Counsel's Failure To: (1) Inform Charles of His Strategy, Any Affirmative Defenses and His Theory of His Defense; (2) Subpoena Critical Witnesses; and (3) Raise Issues to Help Prove Charles' Case.**

At all critical stages of the proceedings, Sparks failed to adequately communicate with Charles regarding the strategy, theory, and affirmative defenses of his case. Charles was not informed about how Sparks intended to challenge the government's evidence, the legal theories under which he could be acquitted, or the specific defenses available to him. This lack of communication prevented Charles from participating meaningfully in his own defense, deprived him of the

34

opportunity to make informed decisions, and undermined the effectiveness of his representation.

Furthermore, there were several critical aspects of the trial that Sparks either failed to raise or neglected altogether, including:

1.    Failure to Subpoena or Impeach Critical Witnesses:

a. John Lawson ("Lawson"). Sparks rendered constitutionally deficient performance by failing to object to Officer Parke's testimony that Charles sold methamphetamine to Lawson, without providing Charles the opportunity to confront Lawson. Under the Sixth Amendment Confrontation Clause, a criminal defendant has the right to cross-examine witnesses who provide testimonial evidence against him. *Crawford v. Washington*, 541 U.S. 36 (2004), holds that testimonial statements of a witness absent from trial are inadmissible unless the defendant had a prior opportunity to cross-examine.

Here, Lawson was allegedly the recipient of methamphetamine from Charles, yet Sparks failed to subpoena Lawson to testify or otherwise confront this allegation. As a result, the jury heard unchallenged testimony attributing criminal conduct to Charles, depriving him of a fair trial and a meaningful opportunity to cross-examine the purported victim. The Sixth Circuit has emphasized that failure to secure or confront such witnesses may constitute ineffective assistance where the untested testimonial evidence is material to the prosecution's case. See *United States v. Boyd*, 640 F.3d 657, 664 (6th Cir. 2011) (failure to confront or subpoena critical witnesses may satisfy the prejudice prong under *Strickland*).

b. Sloan, Confidential Informant. Charles was prejudiced by the prosecutor's failure to give timely and proper notice that CI Sloan would testify that he sold methamphetamine to Lawson. During a pretrial proffer on January 14, 2022, the government did not inform defense counsel of this anticipated testimony, denying the defense the opportunity to subpoena Lawson to confront him and verify or refute Sloan's allegations. Had Sparks been able to subpoena Lawson, it could have been shown that Sloan's testimony was false or misleading, providing material impeachment evidence that would discredit the CI and challenge the prosecution's case. The prosecution relied heavily on Sloan's testimony, including allegations that Charles sold methamphetamine to Lawson. Sparks failed to subpoena Lawson to confirm or deny this allegation. If Lawson had testified and contradicted Sloan, it would have significantly undermined Sloan's credibility—which was central to the government's conspiracy theory. Failure to secure testimony from a witness capable of impeaching a key government witness can constitute

ineffective assistance where credibility is pivotal to the prosecution's case. In sum, Sparks did not fully pursued to cross-examination Sloan and his inconsistencies were not emphasized, too. The Sixth Amendment Confrontation Clause guarantees the defendant the right to confront witnesses against him, and proper notice of testimony is necessary to meaningfully exercise that right. See *Crawford v. Washington*, 541 U.S. 36, 53–54 (2004).

c. <u>Cloyd, co-defendant</u>. In this case, Cloyd pleaded guilty to the alleged conspiracy and received a sentence of less than ten years in exchange for testifying against Charles and Vassor. During his testimony, Cloyd stated, in essence, "not so much an agreement, I did it," directly undermining the existence of a conspiratorial agreement—the essential element of Count 1s. Throughout trial, the prosecutor repeatedly characterized Sloan as a co-conspirator. Sparks failed to consistently object or request jury instructions clarifying that a confidential informant cannot be a member of a conspiracy because the informant acts to frustrate the conspiracy once employed by the government. As a result, the jury was likely misled into believing that any conversation or interaction with Sloan automatically implicated Charles in a conspiracy, when in fact no agreement existed between Charles and Sloan.

Additionally, Sloan made multiple inconsistent and potentially false statements regarding Charles' alleged drug sales and involvement in the conspiracy. Sparks did not adequately pursue cross-examination to highlight these contradictions. For example:

- Sloan claimed Charles sold methamphetamine to Lawson, yet Lawson was never subpoenaed to confront or discredit this allegation.

- Sloan's testimony about Charles' role in the conspiracy was contradicted by other evidence, including controlled buy videos, yet Sparks failed to emphasize these inconsistencies to the jury.

Lastly, Sparks did not request jury instructions explaining how to assess the credibility of a confidential informant or a drug addict. Sloan admitted using methamphetamine while acting as a government informant. Without proper instructions, the jury lacked guidance on evaluating Sloan's testimony, leaving them susceptible to giving undue weight to statements that were unreliable or self-serving. Had Sparks properly challenged Sloan's testimony—through effective cross-examination, objections to mischaracterizations, and appropriate jury instructions—the jury's assessment

of his credibility would likely have been significantly altered. Sloan's testimony was central to the government's theory of conspiracy; failure to confront it allowed the jury to accept the prosecution's account uncritically, undermining the fairness of the trial and contributing directly to Charles' conviction.

2.    Failure to Obtain Critical Evidence:

a. GPS Data. During trial, Officer Parke testified that he monitored Charles' vehicle using a GPS tracking device. However, he admitted that the underlying GPS data was **never produced to the defense**. Trial counsel Sparks failed to obtain the data prior to trial, despite its potential to provide critical exculpatory evidence.

Sparks also failed to exploit the inconsistencies in Parke's testimony during cross-examination. The GPS evidence would have shown that **Charles' vehicle and co-defendant Cloyd's vehicle never came into contact**, directly contradicting the government's theory that Charles and Cloyd were actively conspiring together. Sparks asked Parke a single question about overlap but left the matter unresolved, failing to emphasize to the jury that the purported conspiracy between Charles and Cloyd lacked any factual basis in the GPS monitoring.

By neglecting to obtain the GPS records and failing to press this point effectively, Sparks deprived Charles of an opportunity to present concrete evidence disproving the alleged coordination between him and Cloyd. This omission materially impaired the jury's ability to evaluate the credibility of the government's theory and prejudiced Charles' defense.

b. Phone Records. Sparks failed to obtain Charles' phone records, which could have demonstrated that he did not communicate with co-defendant Vassor on June 8, 2021. See Exhibit 3. The government's theory of conspiracy heavily relied on the assumption that Charles and Vassor coordinated on that date.

Furthermore, one central issue Charles believes should have been raised concerns the government's theory of conspiracy between Charles and co-defendant Vassor, particularly relating to the alleged June 8, 2021 phone call. Here, Charles maintains that: (1) He and Vassor did not speak on June 8, 2021; (2) Even assuming *arguendo* that a phone call occurred, there was no evidence establishing an agreement to distribute narcotics; and (3) A mere referral of a customer from one supplier to another does not, standing alone, establish a conspiracy.

37

The trial evidence—including the controlled buy video—showed Vassor telling a buyer words to the effect of: "Just call him, he has it cheaper," and that Charles "does not have anyone in his business." Such statements suggest independence rather than coordinated joint activity. Referring a customer to another person, without proof of an agreement to jointly undertake criminal activity, does not satisfy the essential element of a conspiratorial agreement.

Had Sparks obtained and introduced these records, they would have directly contradicted the prosecution's narrative, showing that no communications occurred and undermining the allegation of an active agreement between Charles and Vassor. Sparks' failure to secure and present this evidence prevented the jury from considering a critical fact that could have negated the alleged conspiracy, contributing substantially to Charles' conviction.

c. <u>Pole Camera Footage</u>. Here, Sparks failed to obtain and review pole camera footage that could have verified the government's claims regarding Charles' and Vassor's alleged visits to co-defendant Cloyd's residence on February 1, 2021. Officer Parke testified that he observed Charles and Vassor at Cloyd's home, but Sparks did not move to subpoena or introduce the pole camera recordings that could confirm or refute this testimony.

Proper review of the footage would have allowed counsel to show the jury that the defendants' presence at Cloyd's residence was either misstated, misrepresented, or did not occur in the manner alleged by law enforcement. By failing to obtain this evidence, Sparks deprived Charles of a critical opportunity to challenge the government's assertions about the alleged conspiracy and the timing of the alleged coordination between the defendants. This failure contributed to the jury accepting the prosecution's narrative without scrutiny.

3.    <u>Failure to File Key Motions</u>:

a. <u>Failure to File Motion to Suppress Evidence from Pre-Warrant Search</u>. Sparks failed to file a motion to suppress evidence obtained during the search of Charles' residence on June 8, 2021, despite evidence suggesting the search occurred before the warrant was signed at 8:54 PM. Body-worn and stationary camera footage, as well as testimony from Freeman and neighbor, indicated that law enforcement entered the residence earlier, conducted a walkthrough, and disturbed property prior to judicial authorization.

Sparks' failure to pursue a suppression motion deprived Charles of the opportunity to challenge the legality of the search under the Fourth Amendment. Had Sparks filed the motion, the court could have excluded key

38

evidence, including firearms and drugs allegedly recovered during the search, which were central to both the § 922(g) and drug trafficking charges. This omission undermined the defense, allowing the jury to consider evidence obtained in violation of Charles' constitutional rights.

b. Failure to Move to Sever Count 7s (18 U.S.C. § 922(g) Felon-in-Possession). Sparks failed to file a motion to sever Count 7s, charging Charles with being a felon in possession of a firearm under 18 U.S.C. § 922(g), from the remaining drug and conspiracy counts. The Sixth Circuit has long recognized that evidence of a prior conviction is highly prejudicial and that courts must weigh the risk of unfair prejudice against judicial efficiency in joinder. See *United States v. Williams*, 758 F.2d 695, 701 (6th Cir. 1985) (joinder of counts may be improper if evidence of prior convictions would "inflame the jury and prejudice the defendant").

By failing to seek severance, Sparks exposed Charles' prior felony status to the jury before trial on the substantive counts, which likely caused the jury to view Charles through a lens of criminal predisposition rather than evaluating the drug and conspiracy charges on their merits. The Supreme Court and Sixth Circuit have repeatedly emphasized that a jury should not be influenced by evidence of prior bad acts when evaluating distinct offenses. See *Old Chief v. United States*, 519 U.S. 172, 181–82 (1997) (evidence of prior conviction may be excluded when its probative value is substantially outweighed by risk of unfair prejudice).

Had Sparks filed a motion to sever, the firearms charge could have been tried separately, preventing undue prejudice to Charles and ensuring a fair trial on the drug and conspiracy counts. Sparks' failure to act in this regard fell below an objective standard of reasonableness and directly contributed to the cumulative prejudice resulting in Charles' convictions.

c. Failure to File a Motion for Access to KSP Trooper Jack Gabriel's Personnel Files. Here, Sparks rendered constitutionally deficient performance by failing to seek discovery of Trooper Gabriel's personnel records, which were critical to impeaching his credibility. Trooper Gabriel testified that Charles swerved in his lane and changed lanes with a delayed turn signal on June 8, 2021. However, this testimony was false: Charles did not swerve or exhibit any impairment, and Gabriel's observation was made while law enforcement, under the direction of Parke, was already tracking Charles using an illegal GPS device. Parke had instructed Gabriel to stop Charles before he even reached the meeting location, undermining the supposed independent basis for Gabriel's observations.

39

Access to Gabriel's personnel files could have revealed past citizen complaints, disciplinary actions, planted evidence, racial bias, or false statements in prior arrest reports — all of which are directly relevant to assessing his credibility. Under *Giglio v. United States*, 405 U.S. 150 (1972), the government is prohibited from presenting testimony from a witness whose credibility is undermined by known misconduct, and defense counsel has an obligation to investigate and, if necessary, obtain impeachment evidence to protect the defendant's right to a fair trial.

By failing to file a motion seeking Gabriel's personnel records, defense counsel neglected to challenge a key prosecution witness whose testimony was central to the alleged criminal conduct. The Sixth Circuit has consistently held that "failure to investigate and discover information that could be used to impeach critical government witnesses may constitute ineffective assistance of counsel," particularly when such witnesses' credibility is pivotal to the outcome of the trial. See *Lundgren v. Mitchell*, 440 F.3d 754, 774–75 (6th Cir. 2006); *Hodge v. Hurley*, 426 F.3d 368, 376 (6th Cir. 2005). Sparks' failure to investigate and challenge Gabriel's integrity denied Charles a meaningful opportunity to counter materially false testimony and left the jury without critical context to assess the reliability of the government's case, satisfying both prongs of the *Strickland* ineffective assistance test.

4.    <u>Failure to Request Proper Jury Instructions</u>:

a. <u>Failure to Request Jury Instructions Regarding Sloan</u>. In this case, Sparks failed to request jury instructions clarifying how the jury should evaluate the testimony of a confidential informant (CI). The prosecutor repeatedly told the jury that Sloan was a co-conspirator, creating the false impression that any conversation or interaction with Sloan automatically implicated Charles in a conspiracy. Sparks' failure to request instructions deprived the jury of guidance on critical points: (1) A confidential informant cannot be a member of a conspiracy, because he acts to frustrate the conspiracy once employed by the government; (2) The jury needed to understand that conversations with Sloan do not establish an agreement among the defendants themselves, but only provide evidence that must be independently assessed; and (3) Sloan's admitted methamphetamine use while serving as a CI could affect his credibility and required explanation to the jury.

Courts outside the Sixth Circuit have repeatedly held that failing to request instructions limiting the use of informant testimony constitutes deficient performance where the informant's credibility is central to the prosecution's case. See *United States v. Gaudin*, 515 U.S. 506, 522 (jury must be properly instructed on how to evaluate evidence and credibility).

40

Had Sparks requested appropriate CI instructions, the jury would have been less likely to equate Sloan's statements with independent agreement among the defendants. This failure allowed the jury to rely on an erroneous understanding of the evidence, directly affecting the fairness of the trial and contributing to Charles' wrongful conviction.

b. Failure to Request Jury Instructions Regarding CI's Addiction. Defense counsel failed to request jury instructions addressing the impact of Sloan's addiction to methamphetamine on his credibility. Sloan admitted using meth while acting as a government informant, yet the jury was given no guidance on how his substance use could affect his reliability and truthfulness. Proper instructions would have: (1) Informed the jury that a witness's drug use may affect the weight and credibility of their testimony; (2) Prevented the jury from automatically accepting Sloan's statements as truthful despite potential impairment or self-interest; and (3) Guided the jury to evaluate the testimony independently, particularly when Sloan was central to proving the alleged conspiracy.

Other circuits recognize that failure to seek such instructions constitutes deficient performance where a witness's credibility is critical. See *United States v. Gaudin*, 515 U.S. 506, 522 (jury must be properly instructed on evaluating witness credibility). Courts have also held that failure to instruct on impairments affecting credibility may lead to prejudice if the witness's testimony is central to the prosecution. See *United States v. McGill*, 11 F.3d 223, 228–29.

Sparks' failure allowed the jury to give Sloan's testimony undue weight, without considering that his admitted methamphetamine use could diminish reliability. This omission significantly undermined Charles' defense, particularly on key elements of the alleged conspiracy, and contributed to the unfairness of his trial.

5.  Failure to Object to Prosecutor Misconduct: Sparks failed to adequately challenge multiple false and prejudicial statements made by the prosecutor during closing arguments:

   - Mischaracterization of Sloan as a Co-Conspirator. The prosecutor repeatedly referred to Sloan as a co-conspirator, reinforcing the false impression that any interactions with him implicated Charles in the alleged conspiracy. Sparks objected only three times throughout the trial, failing to ensure that the jury received proper guidance. Courts recognize that counsel has a duty to object to materially misleading statements during closing to protect the defendant's right to a fair trial. See *United States v. McGill*, 11 F.3d 223, 228–29 (failure to challenge misleading statements from the prosecution can constitute ineffective assistance). Notably, a confidential informant cannot be

considered a co-conspirator because, by definition, the CI's role is to frustrate the conspiracy while acting under the direction of law enforcement. See *United States v. Riley*, 193 F.3d 515, 520–21 (6th Cir. 1999) (CI cannot be a co-conspirator; statements must be properly contextualized).

- False Statements About Charles' Felon Status. During trial, the prosecutor and the judge incorrectly told the jury that Charles had an agreement with the government and highlighted his prior felony status. Sparks failed to object or request contemporaneous instructions clarifying the falsehood. This allowed the jury to view Charles through a lens of prejudice and bad character, rather than evaluating the evidence on its merits. The Supreme Court has emphasized that counsel's failure to correct materially false statements that could influence the jury can be constitutionally ineffective. See *Napue v. Illinois*, 360 U.S. 264, 269 (prosecutor's false statements must be corrected to prevent miscarriage of justice).

  Sparks' failure to object to repeated mischaracterizations and false statements materially impaired the fairness of the trial. The cumulative effect reinforced the prosecution's narrative while allowing the jury to draw improper inferences about Charles' character and alleged participation in a conspiracy. Proper objections, motions for curative instructions, or requests for jury clarification could have mitigated the prejudice and significantly impacted the outcome.

- Selective Prosecution. Defense counsel failed to raise the issue of selective or discriminatory prosecution, despite overwhelming indicators that the federal investigation and charges were applied unevenly along racial lines. In this case, Sloan, a Caucasian male, was placed in a position to conduct controlled purchases targeting Charles, Vassor, and Cloyd, all African-American men.

  Before becoming a confidential informant, Sloan was already under law enforcement scrutiny for narcotics distribution. Multiple controlled buys were conducted through him, and after his arrest, a search of his residence uncovered approximately 13 ounces of methamphetamine, along with pills, heroin, marijuana, and firearms. Despite these serious offenses, Sloan entered into an agreement to work as a confidential informant on December 31, 2020, and signed on January 1, 2021. He admitted to prior sales of cocaine, meth, and firearms.

42

While acting as a CI, Sloan facilitated two controlled buys from Cloyd in January 2021, one from Vassor in February 2021, and an attempted buy from Charles on June 8, 2021 — the date Charles was pulled over by KSP Trooper Gabriel. Yet, despite Sloan's extensive criminal history and direct involvement in these transactions, he was never federally indicted. In contrast, the three African-American men were all federally charged and convicted: Charles received 380 months, Vassor 320 months, and Cloyd less than 10 years (with Cloyd testifying against Charles and Vassor). Collectively, the three men faced nearly 70 years of imprisonment.

This disparate treatment, coupled with the prosecutor's closing argument — stating, "If you find Charles and Vassor guilty, that's three drug dealers off the street" — further inflamed the jury and unfairly painted Charles and Vassor as the sole dangerous actors, while ignoring Sloan's admitted and ongoing drug dealing. Such remarks suggest a prosecutorial bias that singled out African-American defendants while giving preferential treatment to a Caucasian cooperator.

This stark disparity raises serious questions of selective prosecution, which violates the Equal Protection Clause. The Supreme Court has held that a defendant must show that the prosecution "has a discriminatory effect and that it was motivated by a discriminatory purpose" to establish a claim of selective prosecution. *United States v. Armstrong*, 517 U.S. 456, 465 (1996). Here, the evidence demonstrates that Sloan — despite his own criminal conduct — was spared federal charges, while Charles and other African-American defendants were aggressively prosecuted and subjected to significantly harsher penalties.

Defense counsel's failure to raise this claim denied Charles a potentially meritorious challenge to the fairness and integrity of his prosecution, satisfying the first prong of the *Strickland* test, and contributed to prejudice by allowing the government's racial disparities and prosecutorial decisions to go unchallenged.

6. <u>Failure to Exploit Conflicting Police Testimony</u>: During trial, multiple law enforcement witnesses, including Detective Parke, Detective Harrison, and Agent Trueblood, provided conflicting accounts regarding GPS monitoring, vehicle tracking, and coordination of the investigation:

- GPS and Vehicle Tracking. Detective Parke testified that he monitored Charles' vehicle via GPS and observed him at Cloyd's residence on February 1, 2021. However, when Sparks questioned him about whether Charles' and Cloyd's vehicles overlapped, **Parke confirmed they never came into contact**. Sparks failed to emphasize this point or highlight the contradiction to the jury, leaving them with the impression that Charles actively conspired with Cloyd.

- Coordination Among Agents. Agent Trueblood testified that he was following Vassor during the February 8, 2021 controlled buy, while Detective Harrison stated the team did not know whose car Vassor would be driving. Sparks failed to challenge or reconcile these inconsistent statements, allowing the jury to accept the prosecution's narrative of a coordinated conspiracy without scrutiny.

Sparks' failure to stress these contradictions prevented the jury from seeing that the government's investigation contained inconsistencies and factual gaps. Effective cross-examination could have demonstrated that the law enforcement narrative was unreliable and manufactured, potentially undermining the prosecution's conspiracy theory. Courts have held that counsel's failure to expose critical inconsistencies in government testimony may constitute ineffective assistance when it affects the jury's perception of credibility. See *United States v. Cronic*, 466 U.S. 648, 656; *United States v. McGill*, 11 F.3d 223, 228–29.

7.  Failure to Present an Alibi Defense: Trial counsel rendered ineffective assistance by failing to investigate and present a viable alibi defense directly contradicting the prosecution's timeline. The government repeatedly argued that Charles was the individual in Frankfort, Kentucky, referenced in a recorded phone call between Vassor and confidential informant Sloan—specifically, that after "his boy finishes with his son," he would call Sloan at 4:00 p.m. on June 8, 2021. The prosecution invited the jury to infer that Charles was physically present in Frankfort in furtherance of the alleged offense.

However, Charles maintains that he was at his residence in Lexington, Kentucky at that time—and, critically, that law enforcement was surveilling him there. If police surveillance logs, GPS data, pole camera footage, dispatch records, or officer testimony established that Charles remained in Lexington on June 8, 2021, then the government's narrative placing him in Frankfort would have been factually impossible.

Under *Strickland v. Washington*, counsel has a duty to conduct a reasonable investigation into readily available defenses. The Sixth Circuit has repeatedly

44

held that failure to investigate and present alibi evidence can constitute deficient performance where the alibi is plausible and material. See *Towns v. Smith* (finding ineffective assistance where counsel failed to investigate and present testimony contradicting prosecution's timeline); see also *Bigelow v. Haviland* (recognizing duty to investigate witnesses who could provide exculpatory timeline evidence).

Here, multiple sources of objective evidence could have substantiated an alibi: law enforcement surveillance logs on June 8, 2021, GPS tracking records (if used), cell tower location data, body camera timestamps, dispatch communications, and testimony from household occupants.

If Charles was physically in Lexington under active police surveillance, he could not simultaneously have been the person in Frankfort referenced in the recorded call. That contradiction strikes at the heart of the prosecution's theory linking him to the alleged coordination on June 8.

Additionally, Charles asserts that officers claimed he was present at Cloyd's residence in early February 2021—specifically around February 1—despite GPS installation not occurring until later in February. That inconsistency further undermines the reliability of the government's timeline and supports the necessity of presenting a coherent alibi-based defense.
Failure to present an alibi defense is not a strategic choice when counsel fails first to conduct an adequate investigation. Under *Strickland*, strategic decisions are reasonable only if made after thorough investigation of law and facts. When counsel neglects to investigate available exculpatory evidence, the decision not to present it cannot be shielded as trial strategy.

Prejudice is clear. The prosecution's case relied heavily on placing Charles at specific locations at specific times—Frankfort on June 8 and Cloyd's residence in early February. If objective evidence demonstrated that he was elsewhere, there is a reasonable probability the jury would have harbored reasonable doubt, particularly as to Count 1s, which depended on coordination and presence.

The Sixth Circuit has emphasized that when the prosecution's case hinges on identity or presence, failure to present available alibi evidence undermines confidence in the verdict. See *Avery v. Prelesnik*.
Accordingly, Sparks' failure to investigate and present an alibi defense—supported by law enforcement's own surveillance records—constitutes deficient performance under *Strickland* and resulted in substantial prejudice, as it allowed the jury to accept an unchallenged and contradictory narrative regarding Charles' whereabouts.

45

7.  <u>Failure to Challenge the § 924(c) Conviction</u>: Charles consistently maintained that his conviction under 18 U.S.C. § 924(c) should have been challenged on trial and direct appeal because the government failed to prove that he possessed a firearm "in furtherance of" a drug trafficking crime.

To sustain a conviction under § 924(c), the government must prove more than mere possession. It must establish a specific nexus between the firearm and the drug trafficking offense — that the firearm advanced, promoted, or facilitated the crime. See *Bailey v. United States*, 516 U.S. 137 (requiring active employment for "use" under § 924(c)); *United States v. Mackey*, 265 F.3d 457 (adopting "in furtherance" nexus requirement).

The Sixth Circuit in *Mackey* made clear that mere proximity is insufficient; courts consider factors such as:
- Whether the firearm was strategically located for quick and easy use;
- Whether it was within arm's reach;
- Whether it was loaded;
- Whether it was possessed during active trafficking conduct;
- And whether circumstances demonstrate that the weapon was meant to protect drugs, proceeds, or facilitate transactions.

Here, the evidence did not establish that:
- Firearms were under Charles' pillow;
- Within arm's reach;
- Strategically placed near a bed, dresser, or transaction area for immediate access;
- Or otherwise positioned in a manner consistent with facilitating active drug trafficking.

Instead, the firearms were located inside a closet, not readily accessible, and not shown to be connected to any ongoing drug transaction. There was no testimony that Charles brandished, displayed, carried, or used a firearm during a drug transaction. Nor was there evidence that he sold drugs from inside the residence in a manner that linked the firearms to active trafficking activity.

The Sixth Circuit has emphasized that "in furtherance" requires proof that the firearm actually furthered the drug crime — not simply that drugs and guns were found in the same residence. See *United States v. Combs*, 369 F.3d 925 (reversing where nexus was insufficiently established absent proof of strategic placement and facilitation). Other circuits similarly require evidence showing that the firearm was strategically located or actively tied to trafficking conduct. See *United States v. Krouse*, 370 F.3d 965.

Under these standards, Charles believed the evidence at trial showed, at most, mere possession in the same residence as alleged drugs, which is legally insufficient to satisfy § 924(c)'s "in furtherance" element.

8.  Failure to Object to Prosecutor's False or Improper Statements. Defense counsel rendered constitutionally deficient performance by failing to object to multiple false or misleading statements made by the prosecutor during summation, which presented the jury with a distorted and inflammatory view of the evidence. Specifically, the prosecutor asserted that: (1) Vassor lived at Charles' house whenever he was in town; (2) Charles had been selling heroin his "entire life"; and (3) Vassor was receiving methamphetamine from Charles.

The failure to object allowed the jury to receive a highly prejudicial and inaccurate portrayal of the facts, inflaming their perception of the defendant's character and criminality. Under *Strickland v. Washington*, 466 U.S. 668 (1984), counsel is required to provide effective assistance, which includes timely objections to improper remarks that misstate the law or the evidence. The Sixth Circuit has repeatedly held that counsel's failure to object to repeated prosecutorial misstatements can constitute ineffective assistance, particularly when such statements are central to the case and influence the jury's perception of the defendant. See *Hodge v. Hurley*, 426 F.3d 368, 376 (6th Cir. 2005); *Lundgren v. Mitchell*, 440 F.3d 754, 774–75 (6th Cir. 2006).

Here, Sparks' inaction during these misstatements permitted the jury to hear false and prejudicial assertions without correction, undermining the fairness of the trial and satisfying both prongs of the *Strickland* test: deficient performance and prejudice to the defense.

Moreover, Sparks was constitutionally ineffective for failing to protect Charles from coercion and prejudice surrounding an "agreement" during the second day of trial. At the outset of trial on January 18, 2022, the court provided preliminary jury instructions inaccurately stating that Charles had a "pre-existing agreement" with the prosecution that he, as an ex-felon, could not possess firearms. **In reality, no such agreement existed at that time.**

On January 19, 2022, during a lunch recess, the prosecutor instructed Sparks to convince Charles to sign an agreement. Sparks pressured Charles into signing the agreement under duress,

47

falsely suggesting it was in his best interest and that signing would prevent the prosecution from introducing his criminal history to the jury. Charles repeatedly expressed that he did not want to sign the agreement, yet Sparks misrepresented the consequences and coerced him into signing, undermining Charles' ability to make an informed decision.

After Charles signed the agreement, the prosecutor informed the judge that the agreement was executed, while misleadingly telling the jury that Charles did not want to sign it. Sparks failed to request contemporaneous jury instructions clarifying the limited scope of the agreement or mitigating the impact of the prejudicial reference to Charles as an ex-felon. As a result, the jury likely relied on the stereotype of "once a crook, always a crook," inflaming bias and prejudice against Charles.

The Sixth Circuit has emphasized that defense counsel must provide competent guidance regarding agreements and ensure that defendants are not coerced into decisions that prejudice their trial rights. See *Strickland v. Washington*, 466 U.S. 668, 688–689 (1984) (counsel's advice and advocacy must be objectively reasonable and safeguard the defendant's rights). Here, Sparks' misrepresentations and failure to protect Charles' interests directly aided the prosecution and allowed highly prejudicial information to influence the jury, satisfying both prongs of the *Strickland* ineffective assistance standard.

Overall, Sparks' repeated failures—failing to subpoena witnesses, challenge Sloan's statements, obtain and use GPS/phone/pole camera evidence, file suppression and severance motions, request jury instructions, challenge prosecutorial misconduct, and emphasize inconsistent government testimony—deprived Charles of a fair trial. The cumulative effect of these deficiencies denied him the ability to meaningfully defend himself and directly affected the jury's verdict.

48

Courts consistently recognize that the combined impact of multiple errors may establish prejudice even where individual errors might not. See *Strickland v. Washington*, 466 U.S. 668, 694; *United States v. Cronic*, 466 U.S. 648, 656.

**D.** **Sentencing Counsel's Failure To: (1) Adequately Challenge the PSR; (2) Argue for Mitigation of Punishment and Object to His Sentence Being Substantively Unreasonable; and (3) Failure to Preserve Meritorious Issues for Appeal Deprived Charles of Effective Assistance of Sentencing Counsel Under the Sixth Amendment, A Fair and Just Sentence.**

1-2.    Failure to Adequately Challenge the PSR and Advocate for Mitigation and Object to Substantive Unreasonableness

During sentencing, Sparks provided minimal review and challenge of the PSR. While he objected to drug quantity, reckless endangerment, and allegations of possession of a dangerous weapon, he failed to address other materially prejudicial statements, including:

- Count 1s was structurally and factually distinguishable as to Charles because the alleged conspiracy was initiated and driven by the confidential informant through controlled purchases involving Vassor and Cloyd—not Charles. The government's own proof showed that the investigation began with controlled buys arranged between the informant and those co-defendants. Any alleged connection to Charles was, at most, peripheral and involved an attempted interaction rather than a completed transaction.

  This distinction matters. A conspiracy under 21 U.S.C. § 846 requires proof of a knowing and voluntary agreement to participate in a drug-trafficking objective. Mere association with participants, mere presence, or even awareness of illegal conduct is insufficient. Where the confidential informant was the catalyst for the transactions and the completed controlled buys involved only Vassor and Cloyd, the evidence tying Charles to the charged agreement was materially weaker. If the only alleged interaction with Charles was an attempted buy—particularly one orchestrated entirely by the government's informant—then the proof of an actual agreement between Charles and another culpable actor becomes highly attenuated.

  At sentencing, Sparks should have emphasized that the conspiracy count improperly swept Charles into conduct initiated and completed by others. The informant's actions framed the scope of Count 1s. The completed drug quantities stemmed from controlled buys with Vassor and Cloyd. Absent independent evidence that Charles

knowingly entered into a shared criminal plan with them, the government's theory risked collapsing conspiracy into guilt by association.

Moreover, sentencing exposure under the Guidelines and statutory penalties often hinges on relevant conduct and drug quantity. If the quantities attributed to Count 1s were derived primarily from the controlled purchases involving Vassor and Cloyd, counsel should have objected to attributing those amounts to Charles absent proof that such conduct was reasonably foreseeable to him and within the scope of any jointly undertaken criminal activity. The court was required to make individualized findings as to scope and foreseeability. Without those findings, broad attribution would have been improper.

Sparks also should have argued that where the government manufactures the structure and scale of a conspiracy through a confidential informant's orchestration of transactions with specific targets, the court must carefully scrutinize whether each defendant actually agreed to the charged objective. An attempted interaction with Charles—particularly if it did not result in a completed transaction—does not automatically establish participation in the same agreement formed through the informant's dealings with others.

In short, sentencing counsel should have argued that Count 1s, as constructed through informant-driven controlled buys with Vassor and Cloyd, did not establish that Charles knowingly joined their agreement. At minimum, the court should have limited any drug-quantity findings and relevant conduct to acts directly attributable to Charles. Failure to make these arguments allowed the sentencing framework to rest on conduct initiated and completed by others, rather than on individualized proof of Charles' own criminal agreement and foreseeable participation.

- False Statements Regarding Charles' Parenting – The PSR claimed Charles failed to properly care for his children. Sparks did not object or present evidence demonstrating that these statements were inaccurate, leaving the court with a distorted view of his character.

- Alcohol Use Allegations – The PSR implied that Charles was under the influence at the time of his arrest, solely because he refused the breath and sobriety tests. Sparks failed to challenge the improper inference that refusal equates to intoxication, leaving a misleading impression for sentencing purposes.

- The Sixth Amendment right to effective assistance of counsel extends to sentencing, including preparation for allocution. Allocution is not a mere formality; it is often the defendant's only direct opportunity to address the court, express remorse, explain circumstances, and humanize himself before sentence is imposed.

-

Here, counsel Sparks advised Charles not to speak at sentencing, allegedly based on the sentencing judge's reputation. As a result, Charles did not personally address the Court and was deprived of the opportunity to present mitigating evidence in his own words — including his family responsibilities, rehabilitation efforts, and personal history.

The Supreme Court has long recognized the critical nature of allocution. See *Green v. United States*, 365 U.S. 301 (acknowledging the historic importance of allocution). While the right of allocution itself arises under Federal Rule of Criminal Procedure 32, counsel's duty to prepare and advise the defendant meaningfully at sentencing is governed by the Sixth Amendment. See *Strickland v. Washington*, 466 U.S. 668.

Effective representation requires more than a perfunctory sentencing appearance. Counsel must investigate, prepare, and present mitigating information that could influence the court's exercise of discretion. See *Wiggins v. Smith*, 539 U.S. 510 (recognizing duty to investigate and present mitigating evidence at sentencing). Although *Wiggins* arose in the capital context, courts have applied its reasoning to non-capital sentencings where counsel failed to develop and present available mitigation.

In this case, Sparks argued only generally for a 20-year sentence. He did not meaningfully highlight mitigating factors such as:

- Charles' role as a father and family provider;
- The absence of violence in the alleged conduct;
- Any positive personal history or characteristics;
- The impact of a lengthy sentence on his children and dependents;
- Disputed or exaggerated PSR characterizations affecting the Court's perception.

Instead of preparing Charles to present a careful, strategic allocution — focused on responsibility, rehabilitation, and future goals — counsel's advice effectively silenced him.

Advising a client not to allocute may, in some circumstances, be strategic. However, when that advice is based primarily on speculation about a judge's reputation rather than a tailored assessment of risk, and when it results in the complete forfeiture of the defendant's only personal opportunity to mitigate sentence, it falls below an objective standard of reasonableness under *Strickland*.

The prejudice is significant. Charles ultimately received a 380-month sentence. Allocution can meaningfully affect sentencing outcomes, particularly in close cases where the court weighs credibility, remorse, and character. There is a reasonable

probability that a prepared, sincere allocution — coupled with a developed presentation of mitigating evidence — could have influenced the Court's evaluation under 18 U.S.C. § 3553(a) and resulted in a lesser sentence.

Counsel's failure to prepare Charles for allocution and failure to meaningfully advocate mitigation at sentencing therefore constitutes ineffective assistance under Strickland's deficiency and prejudice prongs.

Charles was sentenced to 380 months' imprisonment — a term that will effectively consume the majority of his adult life. This extraordinary sentence followed a sentencing proceeding in which mitigating evidence was minimally developed, inaccurate or inflammatory PSR assertions were left unchallenged, and Charles was advised not to personally address the Court.

Under *Strickland v. Washington*, prejudice is established where there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. In the sentencing context, the Supreme Court has made clear that even a modest increase in imprisonment satisfies the prejudice requirement. See *Glover v. United States*, 531 U.S. 198 (holding that "any amount of actual jail time has Sixth Amendment significance").

Here, proper preparation and presentation of mitigation could reasonably have reduced Charles' sentence in several ways:

- By correcting false or exaggerated characterizations in the PSR that negatively influenced the Court's perception;
- By meaningfully presenting his parental responsibilities, personal background, and nonviolent history;
- By allowing Charles to express remorse, accountability, and future goals through allocution;
- By fully arguing the § 3553(a) factors in a tailored, evidence-supported manner rather than offering only a generalized request for a 20-year sentence.

Given the breadth of judicial discretion at sentencing — particularly on non-mandatory components — there is at least a reasonable probability that a fully developed mitigation presentation would have resulted in a materially lower sentence.

52

Because Charles received a 380-month term after a sentencing proceeding in which mitigation was inadequately presented and prejudicial information went uncorrected, the deficiency undermines confidence in the outcome. That is sufficient to satisfy *Strickland*'s prejudice prong. By failing to present this information or argue for a downward variance under 18 U.S.C. § 3553(a), counsel deprived Charles of an opportunity to receive a fair and individualized sentence. Had Sparks acted, there is a reasonable probability that the court would have imposed a lower sentence reflective of Charles' compliance and mitigation factors.

### 3.    Failure to Preserve Meritorious Issues for Appeal

On direct appeal, Charles was entitled to the effective assistance of counsel, including meaningful communication and the presentation of his strongest claims. See *Evitts v. Lucey*, 469 U.S. 387. Yet Charles did not attend any appellate proceedings and was never meaningfully informed which issues Sparks chose to raise or omit. He remained unaware whether key sufficiency challenges, prosecutorial misconduct claims, or sentencing issues were presented. Without consultation or explanation, Charles was deprived of any meaningful opportunity to contribute to his own appeal or to ensure that the most substantial and outcome-determinative arguments were advanced.

Most significantly, Sparks failed to challenge the sufficiency of the evidence supporting the conspiracy conviction. The government's theory relied heavily on a June 8, 2021 phone call between Charles and Vassor. However, the evidence did not establish that Charles and Vassor actually spoke that day. Even assuming *arguendo* that a call occurred, there was no proof of an agreement to distribute controlled substances — the essential element of conspiracy. Mere association, parallel conduct, or referral of a customer to another supplier does not establish the existence of a

conspiratorial agreement. The Supreme Court has made clear that conspiracy requires proof of a knowing and voluntary agreement to commit an unlawful act. See *United States v. Jimenez Recio*, 537 U.S. 270. The Sixth Circuit likewise requires proof that the defendant knowingly joined and participated in the conspiracy's common plan. See *United States v. Hughes*, 895 F.2d 1135.

Further undermining the conspiracy theory was the controlled buy video, which Sparks failed to cite on appeal. That video demonstrated the absence of coordination between Charles and any alleged co-conspirator, contradicting the government's narrative of a unified distribution scheme. By not presenting this evidence in support of a sufficiency challenge, appellate counsel omitted a potentially meritorious argument that went to the heart of the conviction.

Sparks also failed to challenge the sufficiency of the evidence supporting the § 924(c) conviction. The firearms at issue were located inside a closet — not under a pillow, not within arm's reach, and not strategically placed for immediate access. There was no evidence that Charles brandished, displayed, used, or carried a firearm during a drug transaction. Nor was there evidence that the firearms were positioned to protect drugs, proceeds, or facilitate trafficking activity.

Sixth Circuit precedent requires a clear nexus between the firearm and the drug trafficking offense to establish possession "in furtherance of" the crime. See *United States v. Mackey*, 1 F. App'x 451, 456; *United States v. Kuehne*, 547 F.3d 667, 672–73. Mere proximity between drugs and firearms is insufficient; the government must show that the firearm actually advanced or facilitated the drug offense. Here, the record reflected at most possession within the same residence — not possession "in furtherance of" trafficking as required by statute.

Despite the substantial consecutive mandatory sentence attached to § 924(c), counsel did not raise this sufficiency issue on appeal. A successful challenge would have eliminated the mandatory

54

consecutive term and dramatically reduced Charles' overall sentence exposure.

Under *Smith v. Robbins*, 528 U.S. 259, appellate counsel renders ineffective assistance when omitted issues are clearly stronger than those presented and there is a reasonable probability that inclusion would have altered the outcome. Given the weaknesses in the conspiracy proof and the absence of evidence establishing the required nexus under § 924(c), there is a reasonable probability that, had counsel raised these sufficiency challenges, the appellate court could have reversed one or both convictions or vacated the § 924(c) count.

Accordingly, the cumulative failures on appeal — lack of meaningful communication, omission of substantial sufficiency challenges, and failure to target the mandatory consecutive firearm count — undermine confidence in the outcome of the direct appeal and satisfy both the deficiency and prejudice prongs of *Strickland v. Washington*, 466 U.S. 668.

By abandoning these claims, Sparks deprived Charles of a meaningful opportunity to challenge serious constitutional and legal errors. There is a reasonable probability that had counsel properly investigated, preserved, and argued these issues, one or more would have resulted in reversal, remand, or a reduction of sentence, materially altering the outcome of his appeal. This failure constitutes objectively unreasonable performance that prejudiced Charles in violation of the Sixth Amendment (*Strickland v. Washington*, 466 U.S. 668 (1984)).

## VI. CONCLUSION

In light of the foregoing, it is evident that Charles was deprived of his constitutional right to effective assistance of counsel from pretrial through appeal phases of his case. Counsel's failure to adequately inform Charles of the implications of his trial, properly object to inaccuracies in the trial, and advocate for a fair and just sentence constitute deficient performance under the standards

established by *Strickland*, and its progeny. These errors prejudiced Charles, resulting in a significantly harsher sentence than he otherwise would have received had counsel performed competently.

The U. S. Supreme Court has consistently held that a defendant is entitled to effective legal representation at every critical stage of a criminal proceeding, including plea negotiations and sentencing. See *Lafler v. Cooper*, 566 U.S. 156 (2012); *Missouri v. Frye*, 566 U.S. 134 (2012). Here, the failures of Charles' counsel not only undermined the fairness of the proceedings but also led to a fundamentally unjust outcome.

Had Charles been properly informed, represented, and advocated for, it is likely he would have received a substantially lower sentence. These failures deprived him of his rights under the Sixth Amendment, warranting the vacatur of his conviction and sentence.

For these reasons, Charles respectfully requests that the Court grant his § 2255 motion and order appropriate relief, including but not limited to resentencing or an evidentiary hearing to fully assess counsel's deficiencies, resolve facts in dispute between the parties and their prejudicial impact on his case, and to expand an incomplete record.

Respectfully submitted,

Dated: March 29, 2026

*James H. Charles*
JAMES GARFIELD CHARLES
REG. NO. 51535-509
FCI BECKLEY
FEDERAL CORR. INSTITUTION
P.O. BOX 350
GENERAL & LEGAL MAIL
BEAVER, WV 25813