**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**CENTRAL DIVISION**
**LEXINGTON**

**CRIMINAL ACTION NO. 5:21-CR-77-SCM-MAS**
**(Civil Action No. 5:26-CV-140)**

**UNITED STATES OF AMERICA**                                    **PLAINTIFF**

**V.**          **UNITED STATES' RESPONSE TO 28 U.S.C. § 2255 MOTION**

**JAMES GARFIELD CHARLES**                                    **DEFENDANT**

\* \* \* \* \*

The Court should deny James Charles's motion to vacate under 28 U.S.C. § 2255.

[R. 191: Motion at 1874-85; R. 193: Amended Memorandum at 1973-92; *see* R. 195:

Order at 2027 (explaining that "the operative memorandum supporting Charles'[s]

petition is at [DE 193] while his petition remains pending at [DE 191]").]

This case centers on a "drug trafficking conspiracy by James Charles and Vincent

Vassor." *United States v. Charles*, Nos. 22-5424/5427, 2024 WL 4554806, at \*1 (6th

Cir. Oct. 23, 2024). As the Sixth Circuit described:

> Initially, the Government charged a third defendant, Tony Cloyd, with
> conspiracy; however, Cloyd ultimately pleaded guilty to drug trafficking
> and agreed to cooperate with the Government prior to trial. Zane Sloan,
> whom local police had investigated and charged in connection with selling
> methamphetamine, posed as a customer and orchestrated controlled buys of
> drugs involving Charles, Vassor, and Cloyd. Cloyd introduced Sloan to
> Charles in October 2020. Prior to becoming a government informant,
> Sloan estimated he purchased several pounds of drugs from Charles, buying
> methamphetamine 'two or three times,' typically purchasing one or two
> pounds, but '[a] few times' buying 'eight or ten pounds.'

During this period, Vassor was living in Los Angeles but commuted to Kentucky, residing in Lexington—ostensibly at Charles's home—for up to a month at a time. Sloan purchased drugs, including 'cocaine and pills and different things,' from Vassor 'five or six times,' mostly methamphetamine and 'a little bit of heroin,' approximately an 'eight ball and maybe a quarter-ounce,' for a total of approximately four to six pounds.

When Sloan ordered drugs from Vassor, Charles sometimes delivered them. Sloan also ordered drugs from Charles, initially through Cloyd, but later by contacting Vassor. Toward 'the end' of the investigation period, however, Sloan called Charles directly to arrange drug transactions. According to Sloan, Charles, Vassor, and Cloyd became his exclusive sources for methamphetamine from October through December 2020. Cloyd testified that he '[n]ever' obtained drugs from Vassor, and 'really didn't know [Vassor] to be involved in any of it,' nor did he know where Vassor lived. Cloyd and Sloan never discussed Vassor.

Some of the transactions with Sloan involved guns. Sloan transferred guns to Vassor 'two or three times,' ranging from between one to 'five, maybe six' guns in exchange for methamphetamine or money, for a total of 'probably six, seven, [or] eight' guns. He sold Charles 'one gun, maybe two.'

From October through December 2020, Richmond Police conducted controlled buys of methamphetamine from Sloan, resulting in his arrest on New Year's Eve. Police also searched his home, seizing '14 ounces' of methamphetamine, a 'gram of heroin,' and a pound of marijuana that, according to Sloan, all came from Vassor. After his arrest, Sloan agreed to cooperate with law enforcement and help them identify drug suppliers '[u]p the chain.'

While serving as an informant, in January 2021, Sloan contacted Cloyd looking for methamphetamine. Cloyd had never dealt methamphetamine, but he 'called around' looking on Sloan's behalf. Cloyd eventually reached Robert Solomon, who 'got ahold' of the drugs and met Cloyd, Charles, and Sloan to sell the latter 'four to five pounds' of methamphetamine. Though Cloyd did not know from whom Solomon got the methamphetamine, Cloyd 'assume[d] it came from [Charles],' but 'never asked any questions.' Cloyd obtained methamphetamine from Charles and sold it to Sloan an additional 'time or two.' In total, Cloyd called Charles to obtain drugs '[f]our to five' times, buying up to a pound each time. Sometimes Cloyd

paid for the drugs on receipt, other times, Charles 'front[ed]' the drugs to him, and Cloyd paid him later.

On January 7 and January 14, 2021, Sloan conducted two controlled buys from Cloyd that were supplied by Charles.  A third controlled buy took place on February 8, when Vassor sold Sloan a pound of methamphetamine in a Target parking lot.  Sloan secretly recorded the buy.  The video shows Vassor agreeing to 'run to' Charles's house to 'grab' a pound of methamphetamine.  A second video shows Sloan handing Vassor money for the methamphetamine and discussing the payment Sloan owed Vassor for prior transactions.

Sloan arranged for a final controlled buy of three pounds of methamphetamine from Charles on June 8.  That day, Sloan called Vassor on a line monitored by investigators.  Vassor was in California at the time but promised that 'his boy was back at the house' and that Vassor would contact him on Sloan's behalf.  Less than 30 minutes later, Vassor called Sloan back, again on a monitored line, and explained that 'his boy' was with his son out in Frankfort until about 4:00 p.m. and would reach out to Sloan directly afterwards.  Just after 5:00 p.m., Charles called Sloan, stated he was at his house, and agreed on the quantity of methamphetamine Sloan would purchase and the time and location of the sale; investigators also monitored this call.  Law enforcement surveilled Charles's home, and when Charles left, police pulled him over on Richmond Road. Officers seized the three pounds of methamphetamine from the backseat of his car.

That same day, police executed a search warrant for Charles's home, where they discovered almost $25,000 in cash, four pounds of methamphetamine, 200 grams of heroin, and 200 grams of cocaine, all of which . . . was worth between $70,000 to $75,000. Officers also found digital scales, baggies containing narcotics, ammunition, and 14 firearms.

*Id.* at *1-2 (footnote removed).

On July 1, 2021, a federal grand jury indicted Charles.  [R. 1:  Indictment at 26-34.]  The grand jury later returned a Superseding Indictment.  [R. 59:  Superseding Indictment at 260-66.]  Charles went to trial; the jury convicted on all counts.  [R. 82:  Verdict at 387-89.]  The Court sentenced him to 380 months in prison, followed by five

3

years of supervision. [R. 104: Judgment at 484-87; R. 124: Amended Judgment at 620-23.] He appealed; the Sixth Circuit affirmed. *Charles*, 2024 WL 4554806, at *1-16. The Supreme Court denied a petition for a writ of certiorari. [R. 174: Order at 1546.] Charles then filed a § 2255 motion raising numerous arguments centered on claims of ineffective assistance of counsel. [R. 191: Motion at 1874-85; R. 193: Amended Memorandum at 1973-92.][1] Each fails.

To prevail on an ineffectiveness claim, the Defendant bears the burden of showing that (1) counsel's performance fell below an objective standard of reasonableness and (2) counsel's ineffectiveness prejudiced his defense so as to deprive him of his right to a fair trial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). A § 2255 petitioner must satisfy both prongs of the *Strickland* test to demonstrate ineffective assistance of counsel. If the Court determines that petitioner has failed to satisfy one prong, it need not consider the other. *Id*. at 697. A petitioner must prove his allegations by a preponderance of the evidence. *Pough v. United States*, 442 F.3d 959, 964 (6th Cir. 2006).

To show deficient performance, a defendant "must prove that counsel's representation was not merely below average, but rather that it 'fell below an objective standard of reasonableness.'" *United States v. Dado*, 759 F.3d 550, 563 (6th Cir. 2014)

---

[1] To the extent Charles originally wrote, "The Government Committed Prosecutorial Misconduct," [R. 191: Motion at 1877 (capitalization as in original),] he dropped that claim in R. 193. He states no basis to claim, and he does not prove, prosecutorial misconduct; the issue is also waived or abandoned by his lack of argumentation. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

(quoting *Strickland*, 466 U.S. at 688).  Courts "employ a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'"  *Id*. (quoting *Strickland*, 466 U.S. at 689).

To prove prejudice, a defendant "must demonstrate that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of [his trial] would have been different.'"  *Dado*, 759 F.3d at 563 (alteration in original) (quoting *Strickland*, 466 U.S. at 694).  "When determining prejudice, a court must consider the errors of counsel in total, against the totality of the evidence in the case."  *United States v. Munoz*, 605 F.3d 359, 377 (6th Cir. 2010).  "Reasonable probability" means "a probability sufficient to undermine confidence in the outcome."  *Dado*, 759 F.3d at 563 (quoting *Strickland*, 466 U.S. at 694).  Thus, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the [ultimate] judgment."  *West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996) (quoting *Strickland*, 466 U.S. at 691).  Proving ineffective assistance of counsel "is *never* an easy task."  *Carter v. Parris*, 910 F.3d 835, 838 (6th Cir. 2018).

*First*, Charles asserts his counsel was ineffective "by failing to conduct an adequate pretrial investigation, failing to interview and present critical witnesses, and failing to develop and present available defenses."  [R. 193:  Memorandum at 1974, 1978-80.]  He further says that counsel "failed to develop an independent defense theory, failed to adequately investigate the factual basis for the charges, and failed to obtain and use available evidence that could have undercut the Government's proof."  [*Id.* at 1979.]

But he declines to specify what the defense theory should have been, what investigation into the facts he wanted and what it would have revealed, what witnesses should have been identified and what they would have said, what evidence counsel failed to obtain and use, and the like. [*See id.*]  The government has no way to respond to such amorphous, generalized claims.  "Because [Charles] has made only vague conclusory statements without substantiating allegations of specific facts," he does not prove ineffectiveness on either prong, and he does not earn § 2255 relief.  *E.g.*, *United States v. Andrade-Guerrero*, Nos. 2:15-CR-18-ART-REW-1, 2:17-CV-04-ART-REW, 2017 WL 1367183, at *3 (E.D. Ky. Mar. 17, 2017) (collecting cases).

*Second*, Charles says his counsel was ineffective "by failing to properly advise [him] regarding the nature of the charges, the strength of the Government's case, available defenses, and the consequences of proceeding to trial, thereby depriving him of the ability to make informed strategic decisions." [R. 193:  Memorandum at 1974, 1980-82.]  Here, too, Charles's assertions are, broadly, of a generalized, nonspecific nature. He does not specify what about the nature of the charges, for instance, he did not understand.  He had notice of the charges and the possible penalties.  [R. 59: Superseding Indictment at 260-66.]  He essentially had a preview of trial at the preliminary and detention hearing and had notice of the underlying facts through the Complaint. [R. 159:  Colloquy, TR (Preliminary and Detention Hearing) at 1385-1422; R. 1:  Criminal Complaint at 1-8.]  Charles does not specify anything particular about the nature of the charges, the strength of the case, or what defenses he wanted raised for the

6

government to respond to.  He also does not say what he means by the "consequences" of going to trial.  He had a right to go to trial, which he exercised.  He never claims that, had he known some specific fact, that his decision-making would have changed.

The most specific Charles gets is to suggest that counsel did not explain "the mandatory consecutive effect of § 924(c), the guideline exposure, and the likelihood that drug quantity findings would drive the sentencing range." [R. 193:  Memorandum at 1981.]  Even assuming that counsel did not explain those things (or any of the other things that Charles broadly mentions), Charles proves no prejudice.  *See Humphress v. United States*, 398 F.3d 855, 859 (6th Cir. 2005) ("A petitioner who claims that he was denied effective assistance of counsel with regard to whether or not to plead guilty must prove that (1) counsel rendered constitutionally deficient performance, and (2) there is a reasonable probability that but for counsel's deficient performance, the petitioner would have pled guilty.").  Charles never claims, much less proves, that, had he known any of these things, his decision-making (or the outcome of the case) would have changed or that he would have pleaded guilty.  The only path beside trial he could have pursued was a guilty plea, and he makes no suggestion or claim that he would have done so.  *See id.* ("Even assuming that Ray's performance was constitutionally deficient, . . . Humphress's petition must fail because he has not established a reasonable probability that he would have pled guilty if properly advised by counsel.").  Charles's "evasive[ness]" on this point in his § 2255 papers "preclude[s] a finding that there is a reasonable probability that he would have chosen to plead guilty." *Id.*  Further, Charles does not allege, much less

present "contemporaneous evidence," that "it's reasonably probable" that "the government would've" offered a plea agreement that he "would've accepted." *United States v. Singh*, 95 F.4th 1028, 1034 (6th Cir. 2024).

Charles adds one other allegation. On December 22, 2021, the Court conducted an *Iles* / *Benitez* hearing. [R. 53: Minute Entry at 250.] The Court granted Charles's "request for appointment of new counsel" and appointed "new counsel of record." [*Id.*] The Court later denied a motion to continue trial. [R. 56: Virtual Order.] Trial began on January 18, 2022, approximately one month after counsel's appointment. [R. 73: Minute Entry at 299.] Charles says that counsel's "preparation, consultation, and advice during this compressed period cannot be presumed adequate." [R. 193: Memorandum at 1982.] That is wrong; there is, to the contrary, "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Charles faults counsel with nothing specific (at least other than the topics addressed above) in this roughly monthlong period for the government to respond to. So, again, he proves no prejudice and, thus, no ineffectiveness.

*Third*, Charles claims that counsel was ineffective "by failing to meaningfully challenge the sufficiency of the evidence, including the Government's failure to prove that any firearm was possessed 'in furtherance of' a drug trafficking crime as required under 18 U.S.C. § 924(c)." [R. 193: Memorandum at 1975, 1982-84.] His claim centers on the notions that mere possession of a firearm is insufficient and that "a specific nexus between the firearm and the drug trafficking offense" is required. [*Id.* at 1982.]

8

Charles's counsel challenged the sufficiency of the evidence, specifically on the § 924(c) count. [R. 133: Andrew Sparks, TR (Trial Day 2) at 1145-46, 1165.] The Court denied the motion, but that does not mean counsel was ineffective. [R. 133: Court, TR (Trial Day 2) at 1149-54, 1165-66.] Counsel also challenged § 924(c) evidentiary sufficiency on appeal; the Sixth Circuit affirmed, but, again, that does not mean counsel was ineffective. *Charles*, 2024 WL 4554806, at *8-9.

The prosecutor described the nexus between the firearms and the drugs: as to "the 924(c), the two listed firearms were on a shelf in Mr. Charles's bedroom, loaded, each with a round in the chamber. They're in close proximity to $25,000. There's an additional substantial quantity of drugs worth about $40,000 in the home, would be sufficient proof of the 924(c)." [R. 133: Todd Bradbury, TR (Trial Day 2) at 1148.] Based on these factors, the Court held that the jury could "easily conclude that [Charles] possessed these firearms in furtherance of the drug trafficking charges charged in Count 1, the conspiracy charge." [R. 133: Court, TR (Trial Day 2) at 1153.] The Sixth Circuit affirmed:

> Here, the Government found two loaded pistols on a shelf in Charles's bedroom closet. In the bedroom 'just outside' the closet, law enforcement found $25,000 cash, a box of ammunition near the bed, and a paper bag containing pills near the ammunition. The basement of Charles's house contained narcotics in shoe boxes, a duffle bag, and a scale. On this record, the jury could find that Charles placed the pistols within easy reach of his bed to protect the cash, which a jury could infer represented the proceeds of his drug sales. . . . Thus, because sufficient evidence existed for a jury to convict Charles of possessing a firearm in furtherance of drug trafficking, we affirm Charles's conviction.

*Charles*, 2024 WL 4554806, at *9.

9

Charles, as above, fails to specify how he wanted counsel's Rule 29 motion more "targeted." [R. 193:  Memorandum at 1983.]  Counsel, again, challenged the sufficiency of the evidence specifically as to the § 924(c). [R. 133:  Andrew Sparks, TR (Trial Day 2) at 1145-46, 1165.]  *Charles*, 2024 WL 4554806, at *8-9.  The problem for Charles is that there was sufficient evidence on the § 924(c) count, as the prosecutor explained, the Court held, and the Sixth Circuit affirmed.

Charles, at most, re-incants the well-known § 924(c) factors.  [R. 193:  Memorandum at 1983.]  *See, e.g.*, *United States v. Maya*, 966 F.3d 493, 501 (6th Cir. 2020).  But the prosecutor explained why those factors favored guilt and established the requisite nexus, rather than mere possession.  Were the firearms strategically located? "Yeah.  Right there on the shelf in his bedroom where [Charles] slept, not locked up in a safe or anything else." [R. 134:  Todd Bradbury, TR (Trial Day 3) at 1238.]  Were the firearms loaded?  "Both loaded. . . . [T]he firearms were fully functioning as firearms." [*Id.*]  The type of weapon?  "[T]hey are both pistols, easily accessible if someone were to break into the home." [*Id.*]  Was Charles's possession legal?  No.  "Charles had no right to possess a firearm; he was already a felon." [*Id.* at 1238-39.]  The type of drug trafficking crime and the time and circumstances under which the firearms were found? "The firearms were found in the house with, as [the jury] heard from TFO Parke, about $40,000 worth of drugs, another $25,000 in cash." [*Id.* at 1239.]  In sum, "[c]ircumstances clearly show [Charles] had at least one gun to protect his drugs and his money." [*Id.*]  There was, all told, and as the Sixth Circuit already held, sufficient

10

evidence on the § 924(c) count, and the jury could have rationally "found the essential elements of the crime beyond a reasonable doubt." *Maya*, 966 F.3d at 498-99 (explaining deferential sufficiency standard, which "bars courts from intruding on the jury's role to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts"); *see Charles*, 2024 WL 4554806, at *9 (so holding). And because this issue was "answered on direct appeal," Charles "is not now entitled to relitigate th[e] issue in a motion to vacate sentence under 28 U.S.C. § 2255." *DuPont v. United States*, 76 F.3d 108, 111 (6th Cir. 1996).

To the extent Charles bemoans an alleged absence of "tailored jury instructions," [R. 193: Memorandum at 1983,] he, yet again, does not specify what he means. He provides no jury instruction he wanted to be given. The Court gave an instruction tailored to § 924(c). [R. 81: Jury Instructions at 352-53.] Charles identifies nothing particular that counsel should have done differently. Further, to the extent Charles alleges that counsel did not "preserve[] the issue for appeal," [R. 193: Memorandum at 1983,] that is wrong. The Sixth Circuit reviewed the issue, showing that it was preserved. *Charles*, 2024 WL 4554806, at *8-9. Indeed, by making and renewing Rule 29 motions, counsel preserved the sufficiency issue. *United States v. Chance*, 306 F.3d 356, 368-69 (6th Cir. 2002). And, in making generalized Rule 29 motions, counsel was being protective of Charles's rights. "[S]pecificity in a Rule 29 motion is not required." *Id.* at 369. And "where the defendant makes a Rule 29 motion on specific grounds, all grounds not specified in the motion are waived." *Id.* So counsel benefitted Charles by

11

making more generalized Rule 29 motions.  *See Charles*, 2024 WL 4554806, at *5-10 (reviewing evidentiary sufficiency under the normal standard).  Charles establishes neither deficient performance nor prejudice as to these arguments.

*Fourth*, Charles thinks counsel was ineffective "by failing to object to improper evidence, failing to adequately cross-examine Government witnesses, and failing to preserve meritorious issues for appellate review." [R. 193:  Memorandum at 1975, 1984-85.]  As with his earlier arguments, Charles's claims are so vague that the government has nothing specific to respond to.  Charles does not specify any particular evidence that counsel "should have challenged the reliability, relevance, and prejudicial effect of." [*Id.* at 1985.]  He does not state any specific "cross-examination" counsel should have used "to expose weaknesses in the Government's theory," "weaknesses in surveillance interpretation, and the limits of witness knowledge." [*Id.*]  He does not identify what "[e]ffective objections and cross-examination" he wanted or how those things "could have narrowed the evidence, impeached key witnesses, limited improper argument, and preserved stronger issues for appeal." [*Id.*]  He does not say what "meritorious issues" he wanted preserved for appeal. [*Id.* at 1975.]  The government, as earlier, has no way to respond to such amorphous, generalized claims.  "Because [Charles] has made only vague conclusory statements without substantiating allegations of specific facts," he does not prove ineffectiveness on either prong, and he does not earn § 2255 relief.  *E.g.*, *Andrade-Guerrero*, 2017 WL 1367183, at *3 (collecting cases).

*Fifth*, Charles argues that counsel was ineffective "by failing to adequately challenge the Presentence Investigation Report, failing to contest material guideline determinations, failing to present meaningful mitigation evidence, and failing to object to the sentence as procedurally and substantively unreasonable." [R. 193: Memorandum at 1975, 1986-87.] While recognizing that his counsel effectively objected to one proposed enhancement, he generally wanted "more effective advocacy" on "drug quantity, guideline calculations, mitigation, and the reasonableness of the ultimate sentence." [*Id.* at 1986.] The most specific he gets is to say that counsel "had a duty to demand reliable proof and to challenge any [drug] quantity based on speculation, broad conspiracy attribution, or insufficiently individualized findings." [*Id.*] But, again, he does not challenge any specific aspect of the drug quantity calculation. The critical parts of the drug quantity calculation, which qualified him for a base offense level of 38, were the eight distinct actual-methamphetamine weights. [*See* R. 112: PSR ¶ 11.] The first two buys directly involved Charles, so there is no obvious basis (and, again, no specific basis that he provides) to think they should not count toward Charles's drug quantity. [*Id.* at ¶ 7 (explaining that Charles supplied this methamphetamine to Cloyd).] The third buy, from Vassor, was also "supplied by Charles." [*Id.* at ¶ 8 (explaining additional circumstances implicating Charles).] So, again, there is no obvious (or Charles-identified) basis to exclude this buy from Charles's drug quantity. The remaining five actual-methamphetamine quantities were either seized directly from Charles (the three pounds during the traffic stop) or from Charles's home. [*Id.* at ¶¶ 9-10 (explaining

13

circumstances).]  So, yet again, there is no obvious (or Charles-identified) basis to exclude these amounts from his drug quantity.

Further, as the government previously explained, [R. 200:  Response at 2042-43,] even if the Court concludes that one or more actual-methamphetamine amount(s) should have been excluded from the drug-quantity calculation, there are numerous scenarios where the error would be harmless.  In many circumstances, the remaining actual-methamphetamine amount would qualify for a base offense level of 36, two levels lower than the base offense level of 38 that applied at sentencing.  [R. 112:  PSR ¶ 20.] U.S.S.G. § 2D1.1(c)(2).  Exercising the "wide berth" courts have "in choosing the proper scope of post-2255 proceedings," a resentencing after a grant of § 2255 relief "would be [a] *de novo*" resentencing.  *Ajan v. United States*, 731 F.3d 629, 633-34 (6th Cir. 2013). At a *de novo* resentencing, the PSR would apply (or, if it did not, the government would object to the absence of) a two-level drug-premises / stash-house enhancement under § 2D1.1(b)(12).  [*See* R. 126:  Todd Bradbury, TR (Evidentiary Hearing) at 686 ("So, yes, certainly a drug premises enhancement is one that I probably should have objected to the PSR's lack of inclusion.").]  The Court has already held it "clear" that this enhancement applies.  [R. 126:  Court, TR (Evidentiary Hearing) at 705-06; *see* R. 126: Colloquy, TR (Evidentiary Hearing) at 685-88, 701-06 (discussing issue).]  So, even if the base offense level would drop to a 36 under certain versions of Charles's amorphous arguments, the offense level would remain a 38 at resentencing (BOL of 36, +2 for the drug-premises enhancement), leaving the guideline range unchanged.  Accordingly,

Charles proves no prejudice.  *See, e.g.*, *United States v. Castro*, 960 F.3d 857, 867 (6th Cir. 2020) ("[E]ven if the district court erred in applying the enhancement, that error would not have affected Castro's offense level or Guideline range and was therefore harmless.").

To the extent Charles bemoans the absence of "a complete mitigation case," [R. 193:  Memorandum at 1987,] he does not identify anything specific that counsel should have presented in mitigation for the government to respond to.  How did he want to be "humanized"?  [*Id.*]  What "overstatement in the PSR" did he want challenged?  [*Id.*] What "disparity" did he perceive?  [*Id.*]  What reasonableness objections did he want preserved, other than the ones addressed on the merits above or that counsel did preserve via objections and sentencing advocacy?  [*Id.*]  *See also, e.g.*, *United States v. Vonner*, 516 F.3d 382, 389 (6th Cir. 2008) (en banc) ("A litigant has no duty to object to the reasonableness of the length of a sentence . . . *during* a sentencing hearing.").  Charles declines to say.  Further, counsel did humanize him and sought a below-guidelines sentence.  [R. 93:  Sentencing Memorandum at 441-46.]  Charles also had a chance to tell the Court anything he wanted in mitigation, but he chose not to allocute.  [R. 127:  James Charles, TR (Sentencing) at 718.]  He proves no ineffectiveness on these issues.

In any event, Charles's within-guidelines sentence was substantively reasonable. This inquiry "focuses on whether a sentence is too long" and asks whether "the court placed too much weight on some of the § 3553(a) factors and too little on others in sentencing the individual."  *United States v. Parrish*, 915 F.3d 1043, 1047 (6th Cir.

15

2019).  Within-guidelines sentences, like Charles's, are presumptively substantively

reasonable.  *United States v. Hawkins*, 165 F.4th 442, 449 (6th Cir. 2026).  To establish

that a sentence was substantively unreasonable, a defendant must show that "a different

sentence was *required*," not merely that "a different sentence was *justified*."  *United

States v. Brown*, 579 F.3d 672, 687 (6th Cir. 2009).  The Court, over the course of fifteen

transcript pages, carefully and methodically weighed the § 3553(a) factors and imposed a

within-guidelines sentence of 320 months, with a 60-month consecutive sentence for the

§ 924(c) offense, for a total of 380 months.  [R. 127:  Court, TR (Sentencing) at 721-35.]

The Court sensibly and comprehensively considered the § 3553(a) factors, weighing the

aggravating and mitigating features of the case and Charles's history and characteristics.

Charles establishes no error in the Court's thoughtful sentencing analysis; he, again,

states no particular basis to think his sentence was unreasonable.

　　　*Sixth*, Charles asserts that "appellate counsel rendered ineffective assistance of

counsel by failing to raise stronger and clearly meritorious issues on direct appeal,

including challenges to the sufficiency of the evidence and sentencing errors."  [R. 193:

Memorandum at 1975, 1987-88.]  As far as the government can tell, charitably

construing Charles's filing, Charles wishes that appellate counsel had raised the

underlying issues that he now brings as ineffective assistance claims.  [*See id.* at 1987-

88.]  It bears repeating that appellate counsel did challenge evidentiary sufficiency.  *See*

*Charles*, 2024 WL 4554806, at *5-10.  Regardless, because none of Charles's arguments

has merit, counsel was not ineffective for not raising meritless claims.  *See, e.g.*, *United*

16

*States v. Thornton*, Nos. 5:15-005-DCR-07, 5:19-083-DCR, 2019 WL 5549216, at *4 (E.D. Ky. Oct. 28, 2019).

*Seventh*, Charles makes a cumulative error argument. [R. 193:  Memorandum at 1975, 1988-89.]  But because Charles does not establish any individual error, there are no errors to cumulate, "and the cumulative error doctrine does not warrant reversal." *United States v. Sypher*, 684 F.3d 622, 628 (6th Cir. 2012).

*Eighth*, and finally, Charles wants an evidentiary hearing. [R. 193:  Memorandum at 1976, 1989-90.]  But because, as explained, "the motion and the files and records of the case conclusively show that [Charles] is entitled to no relief," he is not entitled to one.  28 U.S.C. § 2255(b); *see Martin v. United States*, 889 F.3d 827, 832 (6th Cir. 2018) (describing standard).

The Court should deny Charles's § 2255 motion.

<div style="margin-left: 50%;">

Respectfully submitted,

JASON D. PARMAN
FIRST ASSISTANT
UNITED STATES ATTORNEY

By:    s/ James T. Chapman
       James T. Chapman
       G. Todd Bradbury
       Assistant United States Attorneys
       260 W. Vine Street, Suite 300
       Lexington, Kentucky 40507-1612
       (859) 685-4804
       James.Chapman2@usdoj.gov

</div>

<u>CERTIFICATE OF SERVICE</u>

On June 15, 2026, I electronically filed this response through the ECF system, and

I mailed this response to:

James Garfield Charles
Reg. No. 51535-509
FCI Beckley
Federal Correctional Institution
P.O. Box 350
General & Legal Mail
Beaver, WV 25813
*Pro Se Defendant*

s/ James T. Chapman
Assistant United States Attorney